**CARTER CARBURETOR CORPORATION v. FEDERAL TRADE COMMISSION.**

**No. 434, Original.**

Circuit Court of Appeals, Eighth Circuit.

June 3, 1940.

Noah A. Stancliffe, of New York City
(George T. Barker, of New York City,
George R. Ericson and William R. Gen-

try, both of St. Louis, Mo., Hardy, Stancliffe & Hardy, of New York City, and Watts & Gentry, of St. Louis, Mo., on the brief), for petitioner.

Cyrus B. Austin, Sp. Atty., Federal Trade Commission, of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal Trade Commission, of Washington, D. C., on the brief), for respondent.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This is a petition by Carter Carburetor Corporation (referred to as petitioner) to review a cease and desist order issued against it by the Federal Trade Commission under Section 11 of the Clayton Act, 15 U.S.C.A. § 21, and Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, for violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14 and Section 5 of the Federal Trade Commission Act. The order was issued after hearings had been held upon complaint, amended complaint and answer, at St. Louis, Chicago, Detroit, Philadelphia and New York, at which some 1,500 pages of testimony were taken and more than 300 exhibits were introduced. The findings of fact and conclusions of the Commission were as follows:

"Findings as to the Facts

"Paragraph One: Respondent, Carter Carburetor Corporation, is a Delaware corporation, organized in 1925 with factories and principal offices located at 2820–56 N. Spring Avenue, St. Louis, Missouri. It is engaged in the business of manufacturing and selling, chiefly, carburetors and carburetor parts for use in the automobile industry. It is the successor of Carter Carburetor Company, a corporation which was engaged in the same business from 1909 to 1921 when it went into bankruptcy.

"Par. Two: The respondent and Bendix Products Corporation are the two largest manufacturers of automobile carburetors in the United States. More than 90% of the passenger cars produced in the United States in 1937 were equipped with Carter or Bendix (Stromberg) carburetors. Other carburetors, adopted by automobile manufacturers as standard equipment on recent models are Chandler-Groves, on Packard Six, Plymouth, standard model, Lincoln-Zephyr, and part of Ford; Marvel on Graham, part of Nash and part of Buick and Tillotson on Willys. Zenith Carburetor Company is a subsidiary of Bendix and makes carburetors for replacement use on practically all makes of passenger cars and also truck carburetors.

"Par. Three: Carter Carburetors were standard equipment on 60% of 1937 passenger cars and trucks and on more than half of all passenger cars and trucks sold for three years prior to 1937. Respondent's carburetors were standard equipment on 1937 and 1938 models of Chevrolet, Pontiac, Oldsmobile, LaSalle V–8, DeSoto, Hudson, Terraplane and Reo; also Chrysler-Royal, Plymouth, DeLuxe Model, Cadillac V–16, Dodge trucks and some Studebaker cars and trucks. About 70% of the Carter Carburetors used on Chevrolets are manufactured by the Chevrolet Company in Bay City, Michigan, under license from Carter. These are Carter carburetors and the parts are interchangeable with those manufactured by the respondent. Respondent also makes and sells a number of carburetors which are designed for use in replacing carburetors of various makes and models on automobiles in use, such as the Universal, the Packard, and the Ford carburetors featured in its sales literature. Respondent sold 1,635,000 carburetors to automobile manufacturers in 1937 for use as standard equipment.

"Par. Four: Trade and commerce in carburetors has two principal branches, first, the sale of carburetors to automobile manufacturers for original equipment of automobiles; second, the sale of carburetors and parts for replacement and service of carburetors in use, commonly referred to as 'after market' business. The acts and practices of respondent complained of have been in connection with the after market branch of its business, but competition in the original equipment field as well is affected. Respondent's dollar volume of sales in the two branches is in the ratio of about 5 to 2, so that its after market business amounts to a little less than 30% of the total. Respondent sold more than 103,000 replacement carburetors in 1937 in the after market field, the list prices of such carburetors ranging from $10 to $28 each; and the volume of the after market business was greatly increased by the sale of parts.

"Par. Five: The after market business in the service of carburetors of a new manufacturer entering the field is at first relatively small and takes two or three years to

develop in any volume, because a carburetor ordinarily does not require replacement or repair during the first year or more of use. On recent models little service is required until the car has been driven from 12,000 to 14,000 miles. In the early stages of respondent's business, after market sales amounted to only 5% of its total volume. Nevertheless, service station distribution is necessary at the start so that parts or new carburetors will be available if something goes wrong, and also to be able to assure the automobile manufacturer proper warranty service will be given on the carburetor.

"Par. Six: The carburetor manufacturer customarily warrants his carburetor to the automobile manufacturer to be free from defect of material or workmanship in normal use and service, for the warranty period of the automobile (generally 90 days or 4,000 miles). Respondent has an agreement with practically all of its customers that warranty service will be given, and that repairs during the warranty period will be taken care of by respondent's service stations and distributors without expense to the automobile maker.

"Par. Seven: Most automobile makers desire and rely on the carburetor maker's retail outlets for warranty service and, after the warranty period, for service supplemental to that given by automobile dealers. The automobile dealers also rely on the service stations for a ready supply of carburetor parts for making repairs. Such service can be given by a carburetor maker only through a wide service station distribution of its products, and the availability of such service is considered by most automobile makers (except Ford and possibly Chevrolet) to be a very important factor in connection with the approval of standard equipment. Lists of 'official service stations' are issued by equipment manufacturers and distributed by automobile manufacturers to their dealers for the purpose of making this service available to the dealers and car owners.

"Par. Eight: The business of servicing, replacing and repairing automobiles and automobile equipment is carried on in large part by about 60,000 independent service stations and garages located throughout the United States (not including automobile dealers). Seven thousand or more of these service stations specialize in the service of electrical equipment and carburetors. Practically all stations so specializing carry and sell respondent's products, its products being handled by about six thousand general cabinet stations, and more than 900 contract service stations, as hereinafter described.

"Par. Nine: Modern carburetors are complicated mechanisms, respondent's carburetors comprising some 150 to 175 parts. Competent carburetor service requires special equipment and training not possessed by the ordinary garage and garage mechanic or by many automobile dealers. For this reason the 7,000 specialized service stations above referred to handle a great bulk of the carburetor service business and the remaining 53,000 or more independent repair shops are chiefly garages not specializing in, and in most cases not giving, carburetor service.

"Par. Ten: It is the established custom of the specialized carburetor and ignition stations to offer service on all makes and models or automobiles in current use and to carry in stock and deal in various competing lines of standard equipment in use on such automobiles, so that service can be given on any car that may be driven in. Most service stations originally specializing in the service of electrical equipment have since taken on carburetor service. The larger and better equipped service stations now carry practically all lines of such equipment standard on automobiles, and have contracts with competing manufacturers. A specialized carburetor service station must stock more than one line of carburetors, because the average automobile driver does not know the make of carburetor he has on his car, and different models of the same make of car may carry different carburetors.

"Par. Eleven: Respondent's original distributors had for years previously been specialized ignition service stations. The greater majority of stations now dealing in respondent's products carried other carburetor lines before taking on respondent's line, and still deal in and give service on one or more competing carburetors. Respondent's is one of the newer carburetors in the automotive field, although it has succeeded in acquiring the bulk of the desirable equipment accounts.

"Par. Twelve: For many years it has been the custom for manufacturers of electrical equipment and carburetors, and their distributors, to enter into contracts with the larger independent service stations throughout the country governing the sale

of their products, requiring the service station to carry a stock of the manufacturer's equipment and parts and providing for the price to be paid or discounts to be received by the service station. These contract service stations are known as official service stations of the equipment manufacturer, and are used as service references by the automobile manufacturer.

"Par. Thirteen: Although respondent had some service station distribution prior to 1927 it did not begin to enter the service field on a large scale until 1930, when it began to sell a general parts cabinet to stations throughout the country. Service stations which have purchased and maintained these cabinets now number about 6,000, are referred to as 'general cabinet' stations, and are allowed a discount of 40% on purchases of respondent's products, as against respondent's general trade discount of 25%.

"Par. Fourteen: In 1932, respondent commenced to enter into service station contracts, as above described, offering such contracts in many cases to stations already handling Stromberg or other competing carburetors. Respondent now has between 900 and 1,000 official contract service stations (in addition to the 6,000 general cabinet stations), located in the larger towns, cities and trading areas throughout the United States. These contracts provide that the service station shall receive a discount of 50% (in some cases 50 and 10 percent) from list price on purchases of respondent's products and that service station shall sell and exchange such products at prices and discounts 'recommended' by respondent. Such contracts also so provide that the service station shall give the warranty service [about] described and certain advertising services. The parties to such contracts are the respondent, the regional distributor and the service station. Said contracts are made for a period of one year, subject to renewal and subject to cancellation by any party on thirty days notice.

"Par. Fifteen: Respondent sells and ships its carburetors and carburetor parts f. o. b. St. Louis, to distributors or wholesalers of automotive equipment located in the various states of the United States, who are also under contract with respondent. Regional distributors (66) receive a discount of 60 and 10%, and are granted exclusive territory covering in the aggregate the entire United States. Thirty of said regional distributors have territory located in more than one state. Zone distributors (86) may purchase at 60% discount for shipment either direct from St. Louis or from the regional distributor.

"Par. Sixteen: Both regional and zone distributors' contracts provide that the distributor shall sell respondent's products at prices and discounts specified by respondent, and respondent, in practice, fixes the prices and discounts at which said distributors sell such products. List prices are published in respondent's catalogue. The catalogue list prices are the prices used by the distributors and service stations as a basis for the purchase and sale of Carter carburetors and parts.

"Par. Seventeen: Contract service stations purchase from distributors f.o.b. the distributor's city, but parts cabinets are generally shipped to the service station directly from St. Louis, and occasionally other shipments are so made at the distributor's request. General cabinet stations may purchase either from the distributor or a contract service station, at the prices fixed by respondent. Sales to contract service stations constitute the major part of the distributors' sales of respondent's products.

"Par. Eighteen: Respondent has a large mailing list, including all contract and general cabinet service stations and their personnel, and mails to said stations and personnel from time to time, a large amount of service and sales bulletins, charts, catalogue sheets, and trade information. This literature is very valuable to the service station in the conduct of its business.

"Par. Nineteen: Respondent employs a staff of 19 field representatives who travel in the field and call upon distributors and service stations, maintaining direct contact between respondent and service stations located throughout the country. The country is divided into four districts, each under the supervision of a district manager, who supervises the work of the field representatives in his district. Respondent conducts short training courses at various distribution points, and a school at its factory in St. Louis, where many service station mechanics have received special training in the service and repair of carburetors, and in engine tune-up.

"Par. Twenty: On or about April 1, 1937, respondent mailed to all its distributors, contract service stations, cabinet sta-

tions, and sales service personnel, its General Bulletin No. 134, notifying the service stations 'that if you take on a new carburetor line without our written approval, preferential discount, service information, and Carter contract, if any, will be discontinued by the Carter distributor'. A new carburetor was defined as a carburetor made only since the publication of respondent's Bulletin No. 77, which was dated June 23, 1934. Said Bulletin No. 77 was issued only to respondent's distributors, its gist being that if the distributor took on a competing line of carburetors, he could not expect to hold his Carter representation on an exclusive territorial basis. General Bulletin No. 134 is still in effect.

"Par. Twenty-One: The manager of respondent's Parts and Service Division instructed respondent's field representatives to insist on the enforcement of the policy stated in Bulletin No. 134, and told them to see that the distributors carried out such policy, and to aid the distributors in carrying it out. He also told them to check up on the service stations that they might visit to see whether the service station was handling a new line of carburetors. On April 5, 1937, he sent a telegram to one of his field representatives in Michigan announcing the issuance of Bulletin No. 134, and stating that 'our outlets must choose between Chandler-Groves and Carter' and 'until they make up their minds twenty five per cent will be their discount', and in the meantime 'suspending all contracts and special discounts'. Distributors were to be notified. Copies of this telegram were sent to all of respondent's field men.

"Par. Twenty-Two: Under date of April 7, 1937, a 'confidential' bulletin was sent to all regional and zone distributors requesting them to call on all service stations handling the Chandler-Grove carburetor line, and stating that if service stations kept 'the other line' after May 1, 'mailings to them would be discontinued' and their Carter contracts, if any, would lapse. The standard trade discount of 25% would then apply.

"Par. Twenty-Three: Thereupon, respondent's field representatives, distributors, and distributors' salesmen called upon the service stations and notified them, and thereafter continued to inform them, that the policy stated in Bulletin No. 134 would be enforced. Service stations found to be handling a new competing line of carburetors were told that they could not continue to carry that line and retain their preferential discount and their Carter contract, if they held such contract, and were asked to notify respondent in writing that they had discontinued the competing line and returned their stock.

"Par. Twenty-Four: There appear to be three carburetors which have been made only since June 23, 1934—Chandler-Groves, Mallory, and Fish. Of these, Chandler-Groves is the only one which has been adopted as standard equipment on automobiles. Chandler-Groves carburetors and parts were manufactured by Chandler-Groves Company, a Michigan corporation organized in 1935, with offices and factory in Detroit. Chandler-Groves Company is a wholly-owned subsidiary of Holley Carburetor Company of Detroit, a concern which has for many years manufactured electrical equipment, and formerly carburetors, for the Ford Motor Company and other automobile manufacturers. After December 31, 1937, Chandler-Groves Company ceased to do business, and since that time Chandler-Groves carburetors have been manufactured and sold by Holley Carburetor Company through Chandler-Groves distributors and service stations.

"Par. Twenty-Five: In addition to carburetors, the Chandler-Groves Company at first attempted to develop car heaters, inlet manifolds, fuel pumps, and various other automotive devices. Eventually it developed a single barrel carburetor of the concentric type. Carburetors of that type in use in 1936 were made chiefly by respondent, whereas Bendix Products Corporation manufactured chiefly carburetors of the duplex or double barrelled type. For that reason, during 1936 and 1937, Chandler-Groves Company's competition was mainly with respondent.

"Par. Twenty-Six: In 1936, Chandler-Groves carburetors were adopted for use as standard equipment on Packard Six and Plymouth PT–50 (truck). In 1937, Chandler-Groves became standard equipment on Plymouth standard model passenger car and, late in the year, was adopted for Lincoln-Zephyr and for a part of Fords. In addition to the foregoing, Chandler-Groves was used on several Dodge and DeSoto export models and on the Chrysler industrial engine. The great majority of the carburetors produced by Chandler-Groves Company have been for Plymouth and Packard.

"Par. Twenty-Seven: Adoption of the Chandler-Groves carburetor by Plymouth was announced by Chandler-Groves in a bulletin dated March 10, 1937. Previously, all Plymouth passenger cars had been equipped with Carter carburetors. Respondent received a copy of this Chandler-Groves bulletin a short time before respondent issued its General Bulletin No. 134. Prior to that time, respondent had not objected to its service stations handling Chandler-Groves along with other competing lines.

"Par. Twenty-Eight: In developing its after market business, Chandler-Groves Company followed the usual service station contract plan hereinabove described and, prior to April 1, 1937, had entered into sales agreements with a large number of independent service stations in various parts of the United States specializing in electrical and carburetor service. In soliciting these contracts, the Chandler-Groves distributors approached the larger and better equipped service stations in their respective territories. The Chicago distributor contacted Auto-Lite (Electrical equipment) service stations, and the Philadelphia distributor was also an Auto-Lite distributor and was already selling various kinds of electrical equipment to these service stations. The stations thus contracting with Chandler-Groves were established service stations carrying various lines of automotive equipment, and the great majority of them dealt in the products of respondent and other carburetor manufacturers, many of them being holders of respondent's service station contracts.

"Par. Twenty-Nine: About April 1, 1937, respondent, its field representatives and distributors, commenced to contact and seek out said Chandler-Groves service stations and informed them that, if they continued to deal in Chandler-Groves products, they would no longer be permitted to purchase respondent's products at a favorable discount, would cease to receive service bulletins and information from respondent, and in the case of respondent's contract service stations, that such contracts would be cancelled. Respondent's instructions to its distributors and field representatives, as indicated by its said General Bulletin No. 134 and its confidential bulletin under date of April 7 have been and are being carried out. Respondent has carried out this policy to the extent of cancelling its contracts with and reducing the discounts available to some nineteen service stations refusing to discontinue dealing in Chandler-Groves products. In some instances, respondent offered the service station the privilege of purchasing respondent's products at a more favorable discount than the station was then receiving, upon condition that the service station sever its connection with Chandler-Groves, at the same time threatening to reduce the discount if the service stations would not do so.

"Par. Thirty: As a result of this concerted action by respondent, its field representatives and its distributors, the independent carburetor and ignition stations throughout the country were given a choice of losing the privilege of handling on favorable terms the carburetor which was standard equipment on a majority of automobiles in use and which furnished a large part of their carburetors service business, or of giving up a new carburetor line which was standard equipment on only a few cars, which, even as to those, had not been in the field long enough to require any substantial amount of service. Confronted with these alternatives many service stations throughout the country cancelled their contracts with Chandler-Groves, returning their Chandler-Groves stock or ceased to deal in Chandler-Groves products. In a few cases the service stations refused to comply with conditions imposed by respondent, but these were mostly Chandler-Groves distributors (wholesalers dealing in respondent's products only on a service station basis). In the ten months after April 1, 1937, a substantial number of service stations in various parts of the country severed their official service station connection with Chandler-Groves or returned their Chandler-Groves stock, or both. A large majority of these cancellations and returns occurred in April and May, 1937.

"Par. Thirty-One: About fifty-five service stations in the Chicago, Milwaukee, Detroit and Philadelphia areas cancelled their Chandler-Groves contracts after April 1, 1937, and in most cases returned their Chandler-Groves stock or ceased to purchase their additional stock. After April 1, 1937, the efforts of the distributors in these areas to obtain new Chandler-Groves service station representation met with little success and many service stations assigned opposition by respondent as the reason for their refusing to sign contracts or purchase stock. The Chicago distributor

obtained about forty service station contracts for Chandler-Groves prior to April 1, 1937, and only about ten thereafter; of the fifty contracts obtained, only half were still in force in February, 1938, the other half having been cancelled by the service stations. None of these cancellations occurred prior to April 1, 1937.

"Par. Thirty-Two: Of fifty service stations in the Philadelphia area which held Chandler-Groves contracts during all or part of 1937, thirty-six which did not cancel such contracts purchased an average of $104 worth of Chandler-Groves products per station during the period of April to December of that year. Fourteen stations which cancelled their contracts purchased a net total of $18 worth of Chandler-Groves merchandise during the same period. While there was very little demand for Chandler-Groves products during the first three months of 1937, the fourteen stations which later cancelled their contracts purchased slightly more per station from January to March than the other thirty-six stations.

"Par. Thirty-Three: By the terms of the sales contracts between Chandler-Groves Company and service stations, the service stations agreed 'to prominently display the advertising material of the vendor and to maintain mechanical equipment to efficiently service the product of the vendor'. The sale of carburetors is promoted by the display of stock and advertising material. Some service stations did not return their Chandler-Groves stock after receiving respondent's Bulletin No. 134, but nevertheless refrained thereafter from displaying or advertising Chandler-Groves products, kept such stock out of sight, and ceased to promote the sale thereof.

"Par. Thirty-Four: Respondent has entered into or renewed contracts for the sale of its products with more than 900 service stations on the condition or understanding that the purchasers thereof shall not use or deal in the goods of a competitor or competitors of respondent.

"Par. Thirty-Five: Respondent has fixed the prices charged for its products and discounts from such prices, to approximately 7,000 service stations, on the condition or understanding that the purchasers thereof shall not use or deal in the goods of a competitor or competitors of respondent.

"Par. Thirty-Six: Respondent has made such contracts, fixed such prices, and imposed such condition and understanding, in the course and conduct of its after market, interstate business.

"Par. Thirty-Seven: The effect of the contracts and the condition or understanding mentioned in paragraph thirty-four hereof, and of the condition or understanding mentioned in paragraph thirty-five hereof, has been and may be to substantially lessen competition and tend to create a monopoly in the sale and distribution of carburetors and carburetor parts in interstate commerce.

"Par. Thirty-Eight: The effect of the respondent's above described acts and practices has been to induce, coerce and compel a large number of automobile service stations throughout the United States to cease and refuse to deal in or purchase the products of Chandler-Groves Company and to cancel or violate existing Chandler-Groves sales agreements. Respondent has thereby closed to a competitor a substantial number of actual and potential service station outlets for its products, has diverted business and trade from such competitor, and has prevented such service stations from selling and dealing in a full line of standard carburetors and parts.

"Conclusions.

"1. By its acts and practices described in paragraphs twenty, twenty-one, twenty-two, twenty-three, twenty-nine, thirty-four and thirty-five of the foregoing 'Findings as to the Facts', the respondent, Carter Carburetor Corporation, has violated and is violating Section 3 of the Clayton Act.

"2. The aforesaid acts and practices of the respondent have been and are to the prejudice of the public and of respondent's competitors and constitute unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act."

The petitioner has not included in its points to be argued any contention that any finding of the Commission, which is admitted to be strictly a finding of fact, is not supported by evidence in the record. It has at several places in the brief assailed some of the findings as conclusions, unsupported by and contrary to the record, and has insisted that material facts were not reported by the Commission, al-

though pleaded in the answer to the complaint and shown by irrefutable evidence, and that the record as a whole discloses no violation as charged. Our examination convinces that each of the above findings which is strictly a fact finding is supported by evidence in the record, 15 U.S.C.A. § 45(c), and must be taken as true in this proceeding.

The petitioner admits that it promulgated its General Bulletin No. 134 of date April 1, 1937, to all its distributors, contract service stations, cabinet stations and sales service personnel, notifying "that if you take on a new carburetor line without our approval preferential discount, service information and Carter contract, if any, will be discontinued by the Carter distributor", and that it has taken effective measures to enforce the same, but it contends that there was no violation of the Clayton Act as charged and has argued points for reversal in substance as follows: (a) That in its after market transactions which are here involved it is not engaged in interstate commerce, and that its service station contracts are not contracts for the sale of goods within the meaning of Section 3 of the Clayton Act; (b) that it has not fixed prices (and discounts therefrom) subject to a condition or understanding that the service stations shall not use or deal in the goods of competitors within the prohibition of Section 3 of the Act; (c) that the effect of petitioner's action has not been, and may not be, to lessen competition or tend to create monopoly, and that its action was lawful and without unlawful motive; (d) that its actions do not constitute methods of unfair competition within Section 5 of the Federal Trade Commission Act; (e) that this proceeding was not, and is not, in the public interest, and that it should be dismissed.

(a) *Interstate Commerce.* Section 3 of the Clayton Act denounces making contracts for sale of goods by a person engaged in interstate commerce on the condition or understanding that the purchaser shall not use or deal in the goods of competitors of the seller where the effect of the contract or condition may be to substantially lessen competition or tend to create a monopoly in any line of commerce. The petitioner does not deny that it engages in interstate commerce in that first branch of its business described in the findings (Par. 4) involving the sales of carburetors for original equipment of automobiles. But as to the "second, the sale of carburetors and parts for replacement and service of carburetors in use, commonly referred to as 'after market' business" (id.), it contends that it does not engage in interstate commerce.

It appears that petitioner's sales in this branch of its business are made to some 67 distributors or wholesalers of automotive equipment located in many states, classified by petitioner as "regional distributors". The total sales territory of these distributors covers the entire United States, and thirty of them sell in territory comprising more than one state. Petitioner also ships some of its products directly to more than eighty-six "zone distributors", service stations doing a certain amount of wholesale business who may also purchase from the regional distributors. Both regional distributors' contracts and zone distributors' contracts provide for purchase of carburetors and parts from petitioner at specified prices, f. o. b. St. Louis where petitioner's principal offices and factories are located. Orders are filled by shipment from St. Louis to the distributors and shipments may be made directly to service stations if the distributors so direct. We think that in making such sales and shipments to distributors and service stations located in other states than Missouri, petitioner is engaged in interstate commerce. The fact that petitioner delivers its merchandise f. o. b. St. Louis, title passing there and freight being paid by the purchaser, is immaterial where the actual movement is interstate. Santa Cruz Co. v. Labor Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Pennsylvania R. Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 35 S.Ct. 896, 59 L.Ed. 1406. The contracts between petitioner and its service stations contemplated and required the movement of petitioner's products in interstate commerce. They provide for continuing purchases by the service stations of carburetors and parts to be manufactured by petitioner in Missouri and transported to distributors (also parties to the contracts) in other states, the shipments in some cases being made directly to zone distributors and service stations, and we entertain no doubt that all such contracts, except those involving sales and shipments to distributors and service stations in Missouri, were in the course of interstate commerce.

■ We think it must also be held that the service station contracts were contracts for the sale of goods within the Act. Petitioner concedes that the service station contracts which include the petitioner, its distributors and the service stations as parties thereto "establish the terms and conditions of sales by distributors to service stations, and the actual business in this respect is conducted uniformly therewith", but it argues that the sales which are finally consummated are sales from the distributors and not from petitioner to the service stations. It is to be observed that petitioner not only made the service station contracts in the sense that it was a party to them, but they are essentially petitioner's contracts, made on printed forms issued by petitioner and headed by its name and trade mark and of no validity till approved by petitioner's general manager. The sales provisions are prescribed by petitioner and it fixes and controls the prices and terms upon which the service station receives its products from the distributors, as set forth in the contracts. In the separate contracts with the distributor the distributor agrees to sell at prices and discounts specified by the petitioner. The list prices are found in petitioner's catalog. Complete control of the sales prices and-terms is in the petitioner, and the evidence is clear that it was not the distributors but it was the petitioner which had and exercised the power to impose the conditions of its General Bulletin No. 134 in respect to sales, to cancel the contracts if it saw fit, or to raise the prices on goods to be delivered to the service stations. The method of disposing of products of manufacture in interstate commerce to retailers, who in turn sell to the public, is general in many lines of industry and there is no reason to believe that the scope of Section 3 may be so limited by interpretation as to sanction restraint of trade and monopoly of interstate commerce merely because of such method of distribution.

It is argued that the service station contracts may be regarded as "contracts for services" to be rendered by the stations for the benefit of petitioner and may be related to the many services rendered by petitioner to the stations, and that the contracts should be deemed "service contracts" as between the petitioner and the stations, rather than contracts for the sale of goods. Much of petitioner's complaint in the brief is directed to the failure of the Commission to make findings upon the matter of such services. The Commission found that petitioner "con-

ducts short training courses at various distribution points, and a school at its factory in St. Louis, where many service station mechanics have received special training in the service and repair of carburetors, and in engine tune up", but in its answer to the complaint against it, and in its evidence, the matter of services and the relation of service to petitioner's business and the very great expenditures incurred by it in connection with service were developed in voluminous detail. The importance of service is again urged in the brief and we entertain no doubt that the element of service has been and is a great factor in the building up and maintenance of petitioner's business.

■ But the fact remains that the essential character of the petitioner's business is that of a manufacturer of carburetors and parts, engaged in selling them in interstate commerce for profit. To the extent that it does so in contravention of Section 3 of the Clayton Act, it is amenable to the provisions of the Federal Trade Commission Act. We think no one of the provisions of the service station contracts relating to carburetor servicing, nor all of them taken together, operated to divest those contracts of their essential character as contracts for the sale of goods made in the course of interstate commerce, and we hold that they were contracts for sales of goods within that section. That they may be denominated Service Station Contracts is not controlling. "While this contract is denominated one of agency, it is perfectly apparent that it is one of sale." Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 361, 66 L. Ed. 653.

(b) *Price fixing on conditions against use of competitor's goods.* Petitioner contends that the Commission's findings set forth in paragraphs 34 and 35 are conclusions merely and unsupported. They are to the effect that petitioner has entered into or renewed contracts for the sale of its products with more than 900 service stations on the condition or understanding that the purchasers thereof shall not use or deal in the goods of a competitor or competitors of respondent, and that it has fixed the prices and discounts from such prices to approximately 7,000 service stations on the condition or understanding that the purchasers thereof shall not use or deal in the goods of a competitor or competitors of petitioner.

Petitioner argues that its service station contracts, considered with General Bulletin No. 134, do not effect a fixing of prices on

the conditions denounced by Section 3 of the Clayton Act. Its position is that when due regard is given to the business as a whole it should be found that the service stations are simply accorded a privilege and free choice between taking the Carter goods and performing the services required by Carter on the terms offered, or, in the exercise of their judgment and at their election, to deal with Carter's competitors. The Carter contract forms contain no provision that the service station obligates itself to deal exclusively with Carter.

We think it is clearly proved that petitioner did fix the prices it charged and discounts allowed on purchases of its products by the contract service stations and general cabinet service stations, upon the condition that they should cease and refrain from dealing in a new competing line of carburetors. Petitioner's contracts with distributors require the distributors "to sell and exchange Carter Carburetors at prices and discounts specified by Company", and pursuant to these contracts, petitioner fixes the prices at which service stations may purchase from the distributors, contract service stations purchasing at a discount of 50% and general cabinet stations at a discount of 40% from list prices. Such list prices are published by petitioner in its catalog, which is furnished to all service stations and distributors and kept up to date by a loose leaf system. General cabinet stations may purchase their stock requirements from contract service stations, and the service station contracts likewise provide that the service station shall sell and exchange Carter carburetors and parts at prices and discounts recommended by petitioner. Petitioner thus has established within its own control a complete system of retail price maintenance, effective as to all sales to both contract and general cabinet service stations.

■■ The purpose and effect of General Bulletin No. 134 must therefore be considered in the light of that situation. The Bulletin advised that the preferential discount would be discontinued if a new carburetor line (defined as a carburetor made after June 23, 1934) was taken on without petitioner's written approval. Petitioner gave instructions that if the service stations "should elect to keep the other line * * * the standard trade discount of 25% would then apply". Petitioner's telegram to its field representatives stated that "until they make up their minds twenty-five per cent will be their discount". The policy was enforced by increasing prices to some service stations which refused compliance and by threats of reduction of discounts made to others and by cancellation of contracts. It was made perfectly clear to all service stations that their preferential discount would be available only on condition that they did not carry or take on a new competing line. Under these circumstances it is immaterial that those who handled petitioner's products were not obliged to affirmatively promise in express terms not to handle goods of Carter's competitors. The condition against handling the goods of competitors was made as fully effective as though it had been written in and affirmatively agreed to in express terms in the contracts. Of course it was necessary that the petitioner's distributors should cooperate to effectuate the purpose because the distributors were the immediate source from which the service stations obtained their stocks directly. But there is, and was, no doubt that such cooperation was complete, both in actual practice and according to the terms of the contracts between petitioner and distributors. The arguments presented as to the right of an individual to contract or refuse to contract with whom he pleases must be related to the provisions of Section 3 of the Act and the limitations there imposed. The service stations contracts were intended to and did impose a condition that the purchaser should not deal in the goods of a competitor of petitioner within the prohibition of Section 3.

(c) *Lessening competition and tendency to create monopoly.* The petitioner has very fully detailed and developed out of the mass of testimony in the record, facts and circumstances upon which it contends that the effect of its action in promulgating and enforcing its General Bulletin No. 134 was not and "may not be" to substantially lessen competition or to create a monopoly in commerce in carburetors. The question is primarily a question of fact, though illuminated by many court decisions, and the Commission has found on the issue against petitioner (Par. 37).

Our study of the record has convinced that the Commission has correctly found and described the relevant important factors in the carburetor industry throughout the country and the connection of petitioner's activities therewith, and the actual and imminent effects upon interstate commerce in carburetors of petitioner's action, which is the subject of the complaint herein. There is no doubt that the petitioner occu-

pies a dominating position in the carburetor business of the country and no service station assuming to give a complete carburetor service, other than mere adjustments, could successfully carry on its business or render to the public the kind of service which the special service stations have long given without carrying a stock of carburetors, parts and replacements from petitioner's products.

The long established custom of the special service stations has been to offer carburetor service on all popular makes and models of automobiles in current use and to carry in stock and deal in competing lines of standard equipment. Although there are some 60,000 independent automobile repair shops and garages in the country, the specialized service stations, found to be about 7,000 in number, occupy a position in the business as an outlet for petitioner's goods and render a service to the public which is of paramount importance in the industry, and petitioner has long had the choice of all these specialty organizations and the bulk of their desirable equipment accounts. A large part of the business of the service stations has consisted in servicing the Carter carburetors and any new line, under the circumstances which have prevailed, has offered small opportunity of immediate profit to the service stations. The necessary effect of petitioner's action in promulgating and enforcing its General Bulletin No. 134 was to coerce and compel the service stations which had invested in stocks of the new line of carburetors and parts to dispose of the same and refuse to purchase more, or to cease to display them and conceal them where they would not be observed by petitioner's field men and distributors' solicitors. Undoubtedly petitioner's action deterred many service stations from buying stocks forbidden them in the Bulletin. The effects upon the industry of the bulletin and its enforcement by petitioner were not limited to the commerce carried on by service stations but necessarily reached the original equipment branch of the business. The great measure of reliance put by nearly all the automobile manufacturers upon the equipment manufacturers for warranty service, and after the warranty period for service supplemental to that given by the automobile dealers, is fully shown. The equipment manufacturers have their lists of official service stations and all the automobile dealers get such lists and depend upon them.

It follows that practices of a dominant carburetor manufacturer which are designed to and do prevent a new manufacturer from obtaining a foothold in the service field will handicap the new manufacturer in selling his carburetors for original equipment and may prevent him from marketing a superior product at an equal or lower price. The petitioner's restraint upon competition works in a vicious circle, since service sales on any carburetor normally depend upon the number of automobiles equipped with that carburetor, and loss of service sales and distribution by the carburetor manufacturer in turn affects his ability to meet price competition and service requirements in offering his product for original equipment.

■ We hold that the effect of the action of petitioner here complained of was to lessen competition within the prohibition of Section 3. In United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S. Ct. 363, 66 L.Ed. 708; Vitagraph, Inc., v. Perelman, 3 Cir., 95 F.2d 142; Butterick Co. v. Federal Trade Commission, 2 Cir., 4 F.2d 910, the accused contracts were made directly by the manufacturing company with the dealers and the manufacturer-controlled distributor was not present as a conduit of the goods like in this case, but the principles laid down in those cases none the less control decision here.

■■ The action of petitioner also tends to create monopoly. Although at the time Bulletin No. 134 was promulgated it was undoubtedly directed principally against the competition of the Chandler-Groves Company, it was made applicable to "any other carburetor put on the market since publication of our bulletin No. 77". It must be deemed to have established petitioner's policy to exclude new competition from the carburetor field which if vindicated may be extended to complete monopoly. That petitioner's action has not effected complete monopoly, and that it still does not control all or nearly all of the carburetor business, is not determinative. Sections 2 and 3 of the Clayton Act, 15 U.S.C.A. §§ 13, 14, reflect the intent of Congress to prevent courses of action having a tendency to create a monopoly before actual monopoly has been accomplished and the Federal Trade Commission Act supplies means to effectuate the intent. By its accused action petitioner has attempted to control the carburetor business of practically all service stations specializing in carburetor and ig-

nition service, and they, as observed, perform a vital function in the distribution of carburetors and in meeting the requirements of the public using the carburetors. Hitherto they have serviced the various makes of carburetors. The petitioner attempts to confine them to its own products and so comes within the statute.

It is neither necessary nor relevant to belittle the work petitioner has done in giving instruction and information concerning the complicated mechanism into which its carburetors have been developed; nor to ignore its research and engineering activities or its outlay for advertising and disseminating current advices. It has made great expenditures of time and money to such ends. It results in an ability on the part of the special service stations to render better service to the public. But it does not result in vesting in petitioner a right to dictate conditions in the sale of its goods which are forbidden by Section 3. It is true, as contended by petitioner, that its competitors are left free to go among the 60,000 service stations and to build up new special service stations to compete with those already established by handling products other than petitioner's product. It is also true that the outlays that have been made by petitioner have given the established special service stations some advantages that they avail of when they service products of petitioner's competitors, and such competitors indirectly secure a benefit in that way. It is possible that some stations have made unfair substitutions of Chandler-Groves products in some instances—though we do not so decide. But there is no way by which every bit of the fruit of such large-scale dissemination of information and knowledge as petitioner has carried on can be prevented from spreading out onto the common. Educating remains merely an incident of petitioner's business. The substantial character of its business continues to be the manufacturing and selling of carburetors. The Commission properly found that petitioner's atttempt to coerce the service stations into handling no goods but its own tends to create monopoly within the prohibition of the Act.

(d) *Unfair competition (Section 5, Federal Trade Commission Act.)* The record fully sustains the Commission's conclusion that petitioner has engaged in acts and practices in the conduct of its interstate business which have been and are to the prejudice of the public and of petitioner's competitors and constitute unfair methods of competition in commerce within the intent and meaning of the Act.

Petitioner has interfered with and diverted the business of a competitor, the Chandler-Groves Company, by inducing, coercing and compelling many independent automobile service stations to cancel existing sales contracts with such competitor and to cease and refuse to deal in the products of such competitor. Several service station operators testified as to the coercive effect of the conditions imposed by petitioner, and that solely as a result of such conditions they cancelled their official service station contracts with Chandler-Groves and returned or concealed their Chandler-Groves stock. Petitioner not only threatened to cancel the service station contracts of, and reduce the discounts available to service stations found to be dealing in the Chandler-Groves line, but also threatened to remove such service stations from its mailing list and to discontinue distribution to them of its service and sales bulletins, which it is agreed are valuable and necessary to the service stations.

As stated by the witness Nilsen: "The few parts we had in stock we kept, but we did not talk about it or try to push the line. We felt that we could not go ahead. At first, of course, we thought we might make a business of that along with the other, but naturally when we were told that that was not agreeable to Carter, we simply did nothing about it, did not talk about it, did not try to sell the carburetor, did not do anything." This witness further stated that it had always been his practice to handle all lines of standard automobile equipment so far as he was able to do so; that "as a service station in carburetors, unless you can give service on all cars, it is pretty hard to maintain men who specialize in carburetors, have enough work for them. If you are going to single out one or two lines, it is pretty hard to keep a first-class man on the pay roll. You need service on all makes of carburetors in a small town like we are, to get volume, to maintain a carburetor department." (Oak Park, Ill., where Nilsen is located, has a population of 64,000.)

"Q. Why did you choose to give up Chandler-Groves and retain Carter? A. Because Carter was established with us, and was a profitable line. Chandler-Groves, we felt, had value mainly in the future."

This testimony is characteristic of that given by other service station operators. As a result of petitioner's activities, many service stations which would otherwise have continued to carry both lines cancelled their Chandler-Groves contracts and returned their stock to the Chandler-Groves distributor. Others, like Nilsen (who also cancelled his contract), did not return their stock but thereafter did not display Chandler-Groves carburetors or push the line.

Petitioner directly and consistently interfered with the contract relationships of its competitor, Chandler-Groves Company. Petitioner obtained a list of official Chandler-Groves contract service stations and used this list as a basis for approaching, and for having its distributors approach, service stations which were then representing both Chandler-Groves and Carter. A list of Chandler-Groves service stations in a Carter distributor's territory was sent to the distributor with instructions to have the distributor's salesmen "check with every service account as they go through the territory" and "insist" that the service stations give up the Chandler-Groves line.

The Carter Detroit distributor repeatedly urged the Chandler-Groves Detroit distributor to give up his Chandler-Groves representation after the latter's Carter contract had been cancelled, and stated that a discount of 50% and 10% was being offered to service stations "who would go with Carter and throw out Chandler-Groves". A similar proposition was made by one of petitioner's field men to the Chandler-Groves Fort Wayne, Indiana, distributor, with the alternative of a cut to 25%. Another instance of this practice was with Kritchmer Motor Service of Philadelphia.

On May 22, 1937, petitioner wrote to its Cincinnati distributor stating: "So long as they [service stations] insist on handling C-G material, whether carburetors or parts, we will cancel, and we will recover consignment material such as display stands, cabinets, counterbinder, service station sign, etc., and their future discount will be 25%. There will be no exception in this matter, and we expect distributors to police the situation for us." The activities of the Detroit distributor in enforcing the policy inaugurated by Bulletin No. 134 are described by his testimony. After receiving the confidential letter and telegram he telephoned the service stations known to be carrying the Chandler-Groves line, read excerpts from the telegram, and told them that they would have to choose between Chandler-Groves and Carter. He then called his salesmen together and instructed them to carry out petitioner's policy and to look for Chandler-Groves products when visiting the service stations. No distinction was made between carburetors and parts, although Chandler-Groves parts are non-competitive with Carter parts. The service stations were asked to state their decision in writing. Copies of the letters received were forwarded by the distributor to petitioner.

The method used by petitioner in concert with its distributors and field men go further than a mere refusal to deal, and in that respect are similar to the methods which were used by the Beech-Nut Company in compelling adherence to its resale prices—methods which were declared to be in restraint of trade and an unfair method of competition in Federal Trade Commission v. Beech Nut Packing Company, 257 U.S. 441, 42 S.Ct. 150, 154, 66 L.Ed. 307, 19 A.L.R. 882. In that case the competition affected was price competition in the resale of Beech-Nut products. In the present proceeding the restraint upon interstate trade is much more direct and obvious. The reasoning of the Supreme Court in the Beech-Nut case in holding that the Beech-Nut system unreasonably restrained trade applies equally to the acts and practices of petitioner here, and this case presents a plainer case of unfair competition than was there dealt with by the court. We think the following expressions of the court in that case are directly applicable here: "The system here disclosed necessarily constitutes a scheme which restrains the natural flow of commerce and the freedom of competition in the channels of interstate trade which it has been the purpose of all the Anti-Trust Acts to maintain. In its practical operation it necessarily constrains the trader, if he would have the products of the Beech-Nut Company, to maintain the prices 'suggested' by it. If he fails so to do, he is subject to be reported to the company either by special agents, numerous and active in that behalf, or by dealers whose aid is enlisted in maintaining the system and the prices fixed by it." Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441, 453 [42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882]; Whole-

sale Grocers' Association v. Federal Trade Commission [5 Cir.], 277 F. 657, 664; Standard Oil Co. v. Federal Trade Commission [3 Cir.], 282 F. 81, 87; L. B. Silver Co. v. Federal Trade Commission [6 Cir.], 289 F. 985, 990.

(e) *The Public Interest.* The point is urged that these proceedings in the Federal Trade Commission are not in the public interest and should therefore be dismissed. Petitioner contends in substance that it simply took steps which were necessary on its part to be taken, to meet and protect itself against unfair trade practices and methods of competition pursued by the Chandler-Groves Company. It presents that its General Bulletin No. 134 was directed against that company and was to meet and counteract its wrongful actions, and that the public interest was not intended to be and in fact was not harmfully affected, and "may not be" so harmfully affected within the purview of the Federal Trade Commission Act. But we think the contentions should not be sustained. We need not decide whether the Chandler-Groves Company has also offended against the Act. The mere fact that its competition with petitioner had reached sufficient importance to make it the more immediate target of petitioner's attack is not controlling. Petitioner's policy was not limited to one competitor. It extended to any new line made after June 23, 1934. It seems clear to us upon the proof in the record that petitioner's course of action is pursued by it by combined and concerted action with its numerous distributors and individual agents, that such combined and concerted action is oppressive and wrongful towards the thousands of independent service stations whose business it directly and immediately restricts and interferes with, and that the public interest is thereby wrongfully and injuriously affected. As was said by the Supreme Court in Eastern States Retail Lumber Association v. United States, 234 U.S. 600, 613, 34 S.Ct. 951, 954, 58 L.Ed. 1490, L.R.A.1915A, 788: "The argument that the course pursued is necessary to the protection of the retail trade and promotive of the public welfare in providing retail facilities is answered by the fact that Congress, with the right to control the field of interstate commerce, has so legislated as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted." And again in Sugar Institute v. United States, 297 U.S. 553, 599, 56 S.Ct. 629, 642, 80 L.Ed. 859: "The freedom of concerted action to improve conditions has an obvious limitation. The end does not justify illegal means. The endeavor to put a stop to illicit practices must not itself become illicit. As the statute draws the line at unreasonable restraints, a co-operative endeavor which transgresses that line cannot justify itself by pointing to evils afflicting the industry or to a laudable purpose to remove them." See Vitagraph, Inc. v. Perelman, 3 Cir., 95 F.2d 142, supra.

Petitioner has laid stress and reliance upon Curtis Publishing Co. v. Federal Trade Commission, 3 Cir., 270 F. 881, affirmed, Federal Trade Commission v. Curtis Publishing Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; and Pictorial Review Co. v. Curtis Publishing Co., D.C., 255 F. 206, but we find those cases inapplicable here and to be distinguished on the facts. It was there recognized that where a producer has built up his business by creating an organization of salesmen devoting their time exclusively to the distribution of his products, he may lawfully maintain the integrity of the organization as an exclusive selling agency. But in this case, the thousands of service stations involved are established independent outlets where the public has been accustomed to go for service on all makes of carburetors and other automobile equipment. Their specialization in ignition service ante-dated the specializing in carburetors. They are not and have never constituted an exclusive selling agency for Carter products. The action of the petitioner was taken to coerce and compel them to change their character and to narrow and limit their customary service to the public and to lessen, restrain and ultimately prevent the legitimate commerce of competitors whose goods were and had been moving in interstate commerce through this important outlet.

In Journal of Commerce Pub. Co. v. Chicago Tribune Co., 7 Cir., 286 F. 111, 113, cited by petitioner, it was held that under the circumstances there shown the Tribune company was properly not enjoined from requiring the carriers of its paper over exclusive routes that it had built up by means referred to in the opinion, to handle the Tribune exclusively. The court noted that "each carrier, though owning his own

'route' and buying outright from day to day his copies of the paper, recognized that the Tribune Company had at least a moral right to a voice in controlling the methods and personnel of the carriers". We think the situation there presented was not analogous to that involved here. Here the public has an interest in the continued independence of the service stations and in fair competition in the carburetor industry, and it is the duty of the court to protect such interest by enforcing the lawful order of the Commission.

The findings and conclusions of the Federal Trade Commission are sustained and the Clerk of this Court is directed to enter the order of this Court against petitioner in form as ordered by the Commission.