**MAXWELL, Commissioner of Revenue of North Carolina, v. SHELL EASTERN PETROLEUM PRODUCTS, Inc.**

**No. 4157.**

**Circuit Court of Appeals, Fourth Circuit.**

**May 4, 1937.**

Harry McMullan and A. A. F. Seawell, both of Raleigh, N. C., for appellant.

Jones Fuller, of Durham, N. C., and Lee Van Roberts, of New York City (R. P. Reade and F. L. Fuller, Jr., both of Durham, N. C., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

Shell Eastern Petroleum Products, Inc., a Delaware corporation, sued in this case to recover from Allen J. Maxwell, Commissioner of Revenue of the state of North Carolina, the sum of $9,000 paid by it under protest as license taxes for the year beginning June 1, 1935, on 130 gasoline and oil filling stations in the state. The case was submitted to the District Judge without a jury upon an agreed statement of facts, and resulted in a judgment for the plaintiff for the amount claimed. The Commissioner appealed on the ground that the sum was properly collected under the state law.

The license taxes were demanded by the commissioner on the ground that the taxpayer was engaged in the business of operating or maintaining in the state 160 automotive service stations, as described in section 162½ of an Act of the General Assembly of North Carolina of 1935, c. 371, § 7880 (93)a of the North Carolina Code of 1935, which is as follows: "Every person * * * engaged in the business of operating or maintaining in this State, under the same general management, supervision or ownership, two or more automotive service stations, or engaged in the business of retail selling and/or delivering of any tires, * * * or motor fuels and/or lubricants, or any of such commodities, or who controls by lease either a lessor or lessee, or by contract, the manner in which any such automotive service station is operated, or the kind or kinds, character or brand or brands of merchandise which are sold therein, shall be deemed a branch or chain automotive service station operator, and shall apply for and obtain from the commissioner of revenue a state license for the purpose of engaging in such business

of a branch or chain automotive service station operator, and shall pay for such license a tax according to the following schedule."

The rates in the annexed schedule require the payment of an annual tax of $715 on 30 stations and $9,715 on 160 stations. The taxpayer, admitting liability for 30 stations owned or operated by it, paid the tax thereon, but denied liability for the additional 130 stations and paid the additional sum under protest.

The relationship of the oil company to the 130 stations in dispute was shown by the agreed statement of facts. All of the stations were owned or held under lease by the oil company, but, prior to the beginning of the tax year, were leased or sublet by it to 130 different firms or corporations, called dealers or operators herein, who were actually connected with or engaged in the operation of the stations. In the case of each station, the oil company and the dealer executed a lease, a sales contract, and a rider to the sales contract; and the rights of the operator in the premises were derived entirely through such lease. In each instance the lease provided for a term of not less than 1 year, nor more than 18 months, unless the oil company itself was a tenant of the premises for a term, in which case the term of the sublease was for the duration of the term of the original lease. The oil company had no right to cancel the lease during the term except for failure on the part of the lessee to perform his covenants. The lessee had no right to assign the lease or to sublet any part of the premises or make any alteration therein without the written permission of the lessor, and the lessee was obliged at the expiration of the term to surrender the premises to the lessor. The lease covered the premises, the improvements thereon, and all equipment and apparatus used in connection with the service station, including pumps and other equipment listed on an annexed schedule. In each case the lease provided for the payment of a fixed monthly rental not exceeding in amount the fair rental value of the premises; but subsequently in many instances the lessor voluntarily reduced the amount of the rent. In other instances the contract of lease was voluntarily modified by an agreement on the part of the lessor to accept in lieu of the specified rental, until further notice, a rental at the rate of a stated sum for each gallon of gasoline delivered into the storage tanks on the prem-

ises, the rent to be paid at the time of each delivery, with the provision, however, that the monthly rental should not be less than a stated number of dollars regardless of the number of gallons actually delivered. The lessee had the privilege in case of notice of revocation of the modification of the lease of terminating the lease on 30 days' notice in writing. In no case was cancellation attempted by the lessor or the lessee during the tax year.

The dealer's sales contract, executed contemporaneously with the lease, provided that the oil company should sell to the dealer, and the dealer should purchase from the company, the dealer's requirements of Shell gasolines, motor oils, and greases. The prices to be paid for products were Shell's posted dealers' prices for the Shell's sales area in which the station is located, as shown on the schedule of prices posted at the Shell bulk depot from which deliveries were to be made. The dealer was required to pay cash on delivery. Provision was made for honoring credit cards issued to purchasers by the Shell Company. The Company was authorized from time to time to place upon the station its usual advertising signs and to enter upon the premises for the purpose of altering, repairing or removing the same, the signs remaining its property. The dealer was forbidden to alter or remove any such sign without the written consent of the company and agreed at the termination of the contract to surrender the signs in good condition. The company retained the right to enter upon the station premises in order to paint the buildings and other structures so as to obliterate colors identifying previous suppliers, and for the purpose of painting the pumps through which the Shell products are sold; and the dealer agreed at the termination of the agreement to obliterate Shell's identifying colors of yellow and red. The agreement was to remain in effect from year to year, provided, however, that the dealer might terminate it at the end of any year by 30 days' notice in writing, and that the company might terminate it at any time by giving 10 days' notice in writing to the dealer.

In all cases where the sales contract provided that the operator should purchase all of his requirements of Shell's products from the taxpayer, the contract was modified prior to June 1, 1935, the beginning of the tax year, so as to eliminate said requirement from the contract, and in lieu thereof was substituted an agreement that the deal-

er should purchase from the company not less and not more than a stated number of gallons per annum. In each instance where the rider was attached, the minimum amount of products which the dealer agreed to purchase represented approximately 50 per cent. of the dealer's yearly requirements of such products for sale at his station.

All of the 130 service stations and the Shell pumps and equipment thereon were painted in yellow and red, the identifying colors of Shell, and carried the usual Shell advertising signs, and none of the stations were painted with the identifying colors of any other company engaged in a similar business or advertised the sale of any competing product. Throughout the tax year all of the stations sold Shell gasoline and lubricating oils and greases and none of them sold the products of any other competing company. Two gasoline pumps were used at each of the filling stations and, at some of the stations, more than two pumps. They were affixed to the premises in the manner common to filling stations and connected with gasoline storage tanks buried beneath the ground. In most instances the station was equipped with a concrete driveway underneath which the tanks were placed. The pumps and tanks in every case belonged to the Shell Company. The cost of installation at each station approximated $35. The cost of removal would be approximately $15, unless the tank was placed under concrete, in which case the cost of removal would be $24.

The particular provision of the statute which must be construed in connection with the circumstances disclosed is that which declares that every person "who controls by lease either a lessor or lessee, or by contract, the manner in which any such automotive service station is operated, or the kind or kinds, character, or brand or brands of merchandise which are sold therein, shall be deemed a branch or chain automotive service station operator." The statute further refers to the matter 'of control in the provision that nothing in the statute shall be construed as placing the license tax on lessors or sublessors of such automotive service stations "who have no control over the operation or management thereof and do not control or restrict the kind or kinds, character, brand or brands of merchandise or price of said brands of merchandise sold or offered for sale therein either in the lease, sub-lease, or by separate contract."

In aid of the interpretation of the statute, the decisions in Gulf Refining Co. v. Fox (D.C.) 11 F.Supp. 425, and Ashland Refining Co. v. Fox (D.C.) 11 F.Supp. 431, affirmed in 297 U.S. 381, 56 S.Ct. 510, 80 L.Ed. 731, are of value. The West Virginia Chain Store Act (Acts W.Va.1933, c. 36) imposed license fees in a graduated scale upon every person who operated or maintained one or more stores under the same general management, supervision, or ownership and declared that the word "store" should be construed to mean and include any store or mercantile establishment owned, operated, maintained, or controlled by the same person. In the cases cited, each filling station was conducted by a dealer under an arrangement with the oil company which included a lease of the premises from the dealer to the company, a license from the company to the dealers to handle its products, and a contract for the sale of the product by the company to the dealer. The company did not exercise full control over the dealer in the strict legal sense, but it had a control sufficient to enable it to enjoy the advantages of a chain store system, because it retained the right to cancel the license agreement and to put an end to the business relation between the parties and at the same time to retain possession of the premises under the lease. Hence it was held that the control contemplated by the statute existed and that the oil company was subject to the tax.

In the pending case the taxpayer contends that it lacks the control indicated by the statute because it cannot dictate the kind of goods that are to be sold at the service stations or the price to be charged therefor; and also because it has no power to cancel the lease of any station during the term. It points out that the dealer is required to buy only 50 per cent. of its requirements of Shell products from the taxpayer; that the price to be paid for these products is fixed by the contract; that there is no restriction upon the price for which they may be resold by the dealer; and that the dealer is not prohibited from the sale of the goods of other oil companies. It is conceded that the dealer may terminate the sales contract only on the expiration thereof, and that the Shell Company may terminate it at any time by giving 10 days' written notice to the dealer; but nevertheless the cancellation of the sales contract does not entail the cancellation of the lease and

the dealer remains in possession of the premises and may engage during the remainder of his tenancy in the sale of other oil products. For this purpose he may make use of the gasoline pumps upon the premises during the term of the lease, provided only that he changes the color of the equipment by obliterating the yellow and red Shell colors. Moreover, the Shell Company retains no right to direct the actual operation of the filling station either as to the advertising by the dealer or as to his books and records, or by otherwise supervising or seeking to exercise control.

Notwithstanding these circumstances, it is a significant fact that during the whole of the tax year, not a single one of the 130 service stations under consideration made any attempt to sell the product of any other oil company, but in every instance continued throughout the year with the distinctive Shell colors and sold the Shell products exclusively. It seems clear that this course of conduct was not fortuitous, but was brought about by the control over the premises which the Shell Company exercised through its ownership or tenancy thereof, and through the agreements between it and the dealer. It is a reasonable inference that in each instance the dealer entered into the contracts of lease and sale, involving the painting of the premises with the distinctive colors, and the agreement to purchase at least 50 per cent. of its Shell requirements from the company, with the purpose at the time of becoming a dealer in Shell products and of selling them exclusively at the station during the period of his tenancy. It was obvious to the parties to the agreements that no other oil company would be willing to sell its product at a Shell station; and indeed, if the Shell pumps and equipment were used, such sales would have been contrary to section 4870 (h) of the North Carolina Code of 1935, which forbids any person to sell any liquid fuels, lubricating oils, or similar products from any container, pump, or other distributing device than those indicated by the name, trade-mark, or other distinguishing mark appearing thereon. The sales contract provided that all of the advertising signs should remain the property of the Shell Company and that the dealer should not alter or remove them without the company's consent. Moreover, the company had the right under the contract from time to time to enter upon the premises and paint out the identifying colors of previous suppliers of the dealer, and to paint the station and the pumps with its identifying colors of yellow and red. This control effectually prevented the use of the station or equipment for the sale of a competing product.

For another important reason, the use of the station for the distribution of the products of other oil companies was rendered impracticable by the arrangement between the parties. The Shell Company controlled the premises as owner or as tenant of the owner; and rival producers, knowing that it would not be possible for them to obtain permanent possession, would be unwilling to incur the expense of a temporary arrangement with the dealer for the sale of their products. The taxpayer has but made another attempt to evade the burden of chain store taxation while retaining the advantages that flow from the operation of many places of distribution of its products under its general control. Previous efforts to accomplish the same result were under attack in Fox v. Gulf Refining Co., 295 U.S. 75, 55 S.Ct. 641, 79 L.Ed. 1311, and it was evidently the purpose of meeting the criticism there offered that led to the modification of the contracts in the pending case before the beginning of the tax year. We are of opinion, however, as the actual experience during the tax year demonstrates, that no substantial alteration was brought about and that the stations in question were actually within the control of the taxpayer as lessor of the premises within the true meaning of the statute.

The judgment of the District Court must therefore be reversed.