## UNITED STATES v. RICHFIELD OIL CORP.

### No. 6896–Y.

United States District Court
S. D. California,
Central Division.
July 2, 1951.

William C. Dixon, Sp. Asst. to Atty. Gen., Theodore M. Alexander, T. Keister Greer, Theron M. Hall, Lawrence M. Somerville, Sp. Attys., Anti-Trust Division, Department of Justice, all of Los Angeles, Cal., for plaintiff.

William J. DeMartini, Robert E. Paradise, Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

This is an action instituted by the United States Government against Richfield Oil Corporation,—to be referred to as Richfield,—a corporation organized under the laws of the State of Delaware, with offices and its principal place of business in Los Angeles, California, in which the Government seeks equitable relief under Section 4 of the Act of the Congress of July 2, 1890, commonly referred to as the Sherman Anti-Trust Act[1], and under Section 15 of the Act of the Congress of October 15, 1914, as amended, commonly known as the Clayton Act.[2] The Government seeks to prevent and restrain violations of Section 1 of the Sherman Anti-Trust Act[3] and Section 3 of the Clayton Act.[4]

I

The Nature of the Controversy

Richfield is engaged in the business of acquiring and developing oil reserves and producing, transporting, refining and marketing petroleum and petroleum products therefrom in the States of California, Oregon, Washington, Nevada, Idaho, Arizona, Texas and New Mexico. No evidence was offered relating to activities in the States of Texas and New Mexico, but the pleadings alleged, and the evidence in the case showed, that, in the disposition of its products in the first six States named, Richfield availed itself of various forms of outlets which were referred to as L-O (leased-out) stations, and "dealer" stations, designated as 337 and 3-C stations. Through regional representatives, merchandisers, salesmen and others, whose relation to the company need not be gone into, the petroleum products were supplied to the operators of these stations.

Richfield also deals in automotive accessories manufactured by others, which were referred to during the trial as "sponsored products". These consist of replacement parts and articles sold and used in servicing or repairing automotive vehicles. These include tires, tubes, batteries, spark plugs, oil filters, fan belts, battery cables, lamp bulbs, fuses, windshield wiper blades, tire repair and vulcanizing kits, anti-freeze, tire chains, and similar items.

During the trial, these were referred to as "TBA". It is the assertion of the Government that the various agreements, written and oral, existing between Richfield and the operators of these three types of stations, bind them, in effect, to secure *their entire requirements*, both as to petroleum products and TBA, exclusively from Richfield; that they are forbidden to handle petroleum products of any other company or to handle accessories competitive with those distributed or sponsored by Richfield.

In brief, the Government claims that these contracts are an unreasonable restraint of interstate trade or commerce, in violation of Section 1 of the Sherman Act, and substantially lessen competition and tend to create a monopoly in a line of commerce, in violation of Section 3 of the Clayton Act.

Richfield has denied that there is a violation of either statute in their relations with any of the groups of dealers mentioned, ei-

---

1. 15 U.S.C.A. § 4.

2. 15 U.S.C.A. § 25.

3. 15 U.S.C.A. § 1.

4. 15 U.S.C.A. § 14.

ther as to their petroleum products, or as to the sponsored TBA products.

## II
## The Commerce Involved

■ Despite voluminous testimony, the scope of the inquiry is rather narrow. The interstate origin and nature of the commerce of both the petroleum products and TBA is established beyond dispute. The petroleum products originate in oil reserves and producing wells and bulk plants and refineries operated in California and elsewhere, the products of which move across state lines continuously to supply the various stations. Richfield has oil reserves and producing wells in certain oil fields in California. Crude oil is transported by Richfield from producing wells in California to its refineries located at Watson and Vinvale, California. At the Watson refinery crude oil is refined into gasoline and other petroleum products. Richfield owns and operates two natural gasoline plants in California. Gasoline and other petroleum products refined at the gasoline plants in California are shipped by Richfield to its refinery at Watson, California. The petroleum products refined at its refinery at Watson, California, are, in some instances, shipped by Richfield from the refinery to bulk plants located in California, Oregon, Washington, Arizona, Nevada and Idaho. Gasoline and petroleum products are stored in bulk plants, and sold and delivered from time to time to service stations located in the respective states in which the bulk plants are located. Richfield maintains pipe lines in California used by it in transporting crude oil and petroleum products between points solely in California. It maintains automotive vehicles used in making deliveries of petroleum products from bulk plants to service stations located in the respective states in which the bulk plants are located.

Richfield owns 107 bulk plants in California, of which 23 are operated by Richfield and 84 by commission agents, from which petroleum products are distributed by Richfield and commission agents to 1577 service stations in California. It owns 35 bulk plants in Oregon, of which 2 are operated by Richfield and 33 by commission agents, from which petroleum products are distributed by Richfield and commission agents to 388 service stations in Oregon. Richfield owns 36 bulk plants in Washington, of which 4 are operated by it and 32 by commission agents, and from which bulk plants petroleum products are distributed by Richfield and commission agents to 646 service stations in Washington. Richfield owns 7 bulk plants in Nevada, all of which are operated by commission agents, and from which plants petroleum products are distributed by commission agents to 39 service stations in Nevada. Richfield owns 5 bulk plants in Idaho, all of which are operated by commission agents, from which petroleum products are distributed by commission agents to 56 service stations in Idaho. Richfield owns 22 bulk plants in Arizona, of which 2 are operated by Richfield and 20 by commission agents, from which petroleum products are distributed by Richfield and commission agents to 190 service stations in Arizona. In a few instances, petroleum products have been delivered from bulk plants in one state to service stations located in other states.

The sponsored products are manufactured at various industrial plants throughout the United States, from which they find their way first to the storerooms of the authorized Richfield distributors, and then to the shelves of the individual station operators. In some instances, these sponsored products are shipped directly to service station operators. So there is a constant flow of interstate commerce in the operations of the defendant.[5]

5. Santa Cruz Fruit Packing Company v. Labor Board, 1938, 303 U.S. 453, 463, 58 S.Ct. 656, 82 L.Ed. 954; United States v. Yellow Cab Company, 1947, 332 U.S. 218, 224–226, 67 S.Ct. 1560, 91 L.Ed. 2010; United States v. Paramount Pictures, 1948, 334 U.S. 131, 173, 68 S.Ct. 915, 92 L.Ed. 1260; Carter Carburetor Corp. v. Federal Trade Commission, 8 Cir., 1940, 112 F.2d 722, 730; United States v. Standard Oil Company of California, D.C. Cal., 1948, 78 F.Supp. 850, 856, and cases cited in Notes 3 and 4.

■ The competitive products, both petroleum and TBA, which were kept out of these stations as the result of the agreements, were manufactured at various places in the United States. So, in this respect also, if the practices of which the Government complains stand proved, they unquestionably affect the flow of goods and products in interstate commerce.[6] The amount of commerce involved satisfies all the requirements of substantiality laid down by the cases.[7] The anti-trust laws forbid practices through which competitors are "shut out of the market by a provision that limits it (a product), not in terms of quality, but in terms of a particular vendor."[8]

And, as said by the Supreme Court in another case: "The anti-trust laws are as much violated by the prevention of competition as by its destruction."[9]

■ Back of this is the fundamental determination embedded in the anti-trust laws to maintain our national economy free by keeping it competitive. The Supreme Court has expressed this thought very recently: "The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts, as well as in the Robinson-Patman Act, 'Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.' "[10]

A few statistics supplied by Richfield, and culled from the record, will suffice to demonstrate readily that the commerce affected is substantial. The number of L–O stations in 1950 was 1343. The number of 337 stations was 1361. The 3–C stations numbered 261. The Government, by counting the separate written agreements, which go to make up each unit, including the painting agreements, arrives at a total of 4581. If to these are added the oral arrangements affecting the stations, we have a total of 7546 written and oral agreements.

The written contracts are approved at one of Richfield's divisional offices, of which there are three located in the States of California and Washington. The contracts come to the respective offices in those States from various other States for approval. Some of the contracts are required to be approved at the main Richfield office in Los Angeles.

The gallonage of gasoline distributed in 1950, through the L–O stations was 160,795,-000, of the money value of $23,790,968.00. The gallonage of gasoline distributed

6. See writer's opinion in United States v. Standard Oil Company of California, D.C. Cal.1948, 78 F.Supp. 850, 856–864, and cases cited in Footnotes 4–33. And see, Fashion Originators' Guild v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 80, 84–85; Wickard v. Filburn, 1942, 317 U.S. 111, 118–128, 63 S.Ct. 82, 87 L.Ed. 122; Mandeville Farms, Inc. v. American Crystal Sugar Company, 1948, 334 U.S. 219, 229–234, 68 S.Ct. 996, 92 L.Ed. 1328.

7. Standard Oil Company of New Jersey v. United States, 1911, 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619; Indiana Farmer's Guide Company v. Prairie Farmer Publishing Company, 1934, 293 U.S. 268, 278–279, 55 S.Ct. 182, 79 L.Ed. 356; United States v. Columbia Steel Company, 1948, 334 U.S. 495, 525, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Griffith, 1948, 334 U.S. 100, 105–107, 68 S.Ct. 941, 92 L.Ed. 1236; William Goldman Theatres, Inc., v. Loew's, Inc., 1945, 3 Cir., 150 F.2d 738, 744.

8. International Salt Company v. United States, 1947, 332 U.S. 392, 398, 68 S.Ct. 12, 16, 92 L.Ed. 20.

9. United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. Ed. 1236.

10. Standard Oil Company v. Federal Trade Commission, 1951, 340 U.S. 231, 248–249, 71 S.Ct. 240, 249. See the writer's opinion in Balian Ice Cream Company v. Arden Farms Company, D.C.Cal.1950, 94 F.Supp. 796, 801, and cases cited in Notes 18 and 19; and F. & A. Ice Cream Company v. Arden Farms Company, D. C.Cal.1951, 98 F.Supp. 180, especially Note 44, which gives a history of the development of the concept which led to the adoption of the anti-trust laws. And see, Shotkin v. General Electric Company, 10 Cir., 1948, 171 F.2d 236, 238; United States v. South-Eastern, Underwriters' Ass'n, 1944, 322 U.S. 533, 553–554, 64 S.Ct. 1162, 88 L.Ed. 1440. And for a comprehensive review of the anti-trust laws, see, "Anti-Trust Law," The University of Illinois Law Forum, Vol. 1950, No. 4, pp. 491–672.

through the 337 stations during the same year was 67,476,000, with a money value of $10,164,158.00. As to the 3–C stations, the gallonage was 20,385,000, and the money value $3,069,987.00. For the same year the gallonage of motor oils and greases was, as to all types of stations, 3,491,369, of the money value of $2,546,127.59. For the same year, the money value of all accessories sold to the three types of stations was $3,603,003.85. The interstate nature of the commerce involved and its substantiality, both from the standpoint of the number of outlets involved and the quantity and value of the products handled, being evident, the pattern of our inquiry becomes very narrow. It is reduced to the problem whether the agreements through which this commerce was handled are of the type condemned by the decision in the Standard Oil Case [11], rendered by me in 1948, and affirmed by the Supreme Court.[12]

It is to be borne in mind that the opinion of the Supreme Court contented itself with the determination that the agreements there involved violated Section 3 of the Clayton Act. Here, we are concerned with the alleged violation of both Acts. And the case calls for the determination of both questions.

But, while the same principles are to be applied to the three different outlets, it is necessary to examine separately their characteristics, in order to determine whether there is any difference (a) as to the relation existing between the operators and Richfield, and (b) the restrictive practices in effect.

### III

### The Leases on L–O (Leased-Out) Stations

The problem is simplified as to the L–O stations by the Richfield admission that the oral understandings under which the leases are made, and for the violation of which the leases are forfeited under the 24-hours' termination clause, to be referred to, not only provide but *demand* that Richfield petroleum products and Richfield-sponsored TBA products be handled exclusively and without deviation.

So the main consideration as to these stations is the relations which control them. The extent of the commerce affecting these stations has already been adverted to. It should be added that Richfield claims an investment in these stations as of December 31, 1950, of $19,542,082.58, of which the cost of the land purchased represents $11,213,657.33, and the cost of improvements installed, $8,328,425.25. The figures as to improvements relate chiefly to the stations themselves, and adjunct buildings and the permanent equipment. They do not include improvements such as tanks, pumps, compressors, hoists, neon signs, hiboys and the like.

In justification of the investment, and, for that matter, of the entire policy, Richfield asserts that once "the shooting war" was over, and the purchase of gasoline by Government agencies had decreased, it was *compelled* to find an outlet for the increased refining facilities which it had built during the war period, and that the only certain way of securing an assured market was through controlled units.

 Intent and purpose are an element in a case involving violation of Section 2 of the Sherman Act [13]. But such violation is not concerned with a specific intent. And a specific intent, or good motive, for that matter, is not material when we deal with Section 1 of the Sherman Act [14], or Section

---

11. United States v. Standard Oil Company of California, D.C.Cal.1948, 78 F.Supp. 850.

12. Standard Oil Company of California v. United States, 1949, 337 U.S. 293, 69 S. Ct. 1051, 93 L.Ed. 1371.

13. 15 U.S.C.A. § 2. See, United States v. Griffith, 1948, 334 U.S. 100, 105–106, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Paramount Pictures, 1948, 334 U.S.

131, 173–174, 68 S.Ct. 915, 92 L.Ed. 1260.

14. 15 U.S.C.A. § 1. See, Paramount Famous Corp. v. United States, 1930, 282 U.S. 30, 44, 51 S.Ct. 42, 75 L.Ed. 145; United States v. Masonite Corp., 1942, 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461; Fashion · Originators' Guild v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 80, Note 6.

3 of the Clayton Act[15]. The determining consideration is the effect of a particular practice on interstate trade or commerce. Other considerations, *such as economic necessity*, do not, and should not enter into our inquiry whether the practices here involved violate either statute.[16]

Very recently the Supreme Court rejected a contention that the anti-trust statute should not be given full effect in a particular field, in view of certain current foreign trade conditions.[17] The argument is just as valid when applied to market conditions as to petroleum and allied products in a specific area in this country. Economic considerations are relevant in determining legislative policy. They may be important in interpreting the limit of that policy. They do not constitute an excuse for the violation of the legislative policy declared in a statute.

These preliminary observations clear the way for a consideration of the nature of the arrangements under which the L–O stations were operated. The foundation of the relations was the service station lease, denominated Form 542. It was prepared by Richfield, underwent several changes through the years, and, in its final form, as it appears in this case, it was an elaborate lease containing fifteen different clauses setting forth the conditions governing the transfer of the property.

The *habendum* clause of each lease leases the described real property and the improvements and facilities thereon to the designated lessee for a definite period of time, subject to a 24-hours' termination clause, at a specified rental per month, payable in advance on the first day of each of the calendar months. In addition to this, the lessee agrees to pay as rental a sum equivalent to the total number of gallons of gasoline in excess of a certain stated maximum, delivered to the premises during the month for which payment is being made for resale and distribution, the rate being fixed for each of the twelve months of the year, on the basis of the excess over a definite amount of gallons. Richfield has the right to demand a deposit of cash or bond to secure the payment of the rent in amount equal to the average rent payable.

The lease limits the use of the premises to the operator of a gasoline station, prohibits the use for any other or an unlawful purpose, and forbids the commission of a nuisance by the lessee. The prohibition by law of the continuance of the business terminates the lease. There follow provisions placing upon the lessee the duty to maintain the premises and the improvements in good repair and a clean and safe condition, and prohibiting the making of changes or alterations without the permission of the lessor. The remaining clauses may be summed up briefly. The lessee, upon expiration of the lease or its termination, agrees to surrender the premises in as good a condition as when received, wear and tear excepted. Destruction by fire terminates the lease. The lessee is responsible for all charges for utilities. Failure to comply with the terms of the lease, default in payment of rent, bankruptcy or insolvency, the levying of an attachment, assignment or execution, or the institution of any other legal proceedings affecting the premises or any of the equipment on them, is ground for termination without notice. The lease is not assignable, either voluntarily or by operation of law. And the lessee agrees to indemnify the lessor against any claims for injury to property or person occurring on the premises during the operation of the lease by himself, his agents or employees. There follow the usual general clauses protecting against waiver of breach, making provision for attorney's fees for the lessor in case of suit, and designating the place to serve notice, and *merging into the instrument all other agreements*.

15. 15 U.S.C.A. § 14. See, Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 468–469, 61 S. Ct. 703, 85 L.Ed. 949.

16. Standard Oil Company v. United States, 1949, 337 U.S. 293, 311–313, 69 S.Ct. 1051, 93 L.Ed. 1371.

17. Timkin Roller Bearing Co. v. United States, 71 S.Ct. 971.

## IV

### The Nature of the Lessee's Interest

■ If this instrument is assayed by the accepted tests which determine the relation of landlord and tenant, the conclusion is inescapable that it is a lease. For we have a relation which is the result of specific agreement, which calls for (a) a fixed term, (b) at a determined rental, (c) by which a specific estate passes to the tenant, (d) who takes exclusive possession of the premises against all the world, including the owner, (e) all the lessee's rights being subordinated to the primary right to the fee of the owner, and (f) subject to reversion to him at the end of the term, or on termination of the lease.[18]

Implicit in the contract is the lessee's assumption of obligation and responsibility for his own acts upon the premises and those of his employees in their relation to the public, who come in contact with them during the time of his dominion. The lessee is not the employee of Richfield. Richfield pays him no wages or other remuneration. He must carry his own workmen's compensation. He is not carried on their books as an employee for the purpose of social security taxes or any of the withholding taxes, state or federal, incidental to the employer-employee relationship. Richfield is not required to withhold any moneys from him for income tax purposes. Neither are they required to perform any of the duties just mentioned as to any of the employees who may assist the lessee in the conduct of the station or of any auxiliary repair work upon the premises. The lessee is solely responsible for his own conduct and that of his employees which may cause damage to the person or property of others. In brief, it would be difficult to find an instrument which so completely makes, by its own terms, the lessee master of the domain covered by the lease as does this lease. He is certainly as independent as any lessee is. And the relationship is no different than that found in the "leased-out" stations in the Standard case.[19]

■ When, in law, we speak of "an independent contractor", or "an independent business man", we deal with a practical concept, not with a philosophical phrase. We mean a person who, in the performance of a particular contract, or in the conduct of his business, acts chiefly *for himself* and *for his own benefit and profit,* and *not* for others and the benefit and profit of others. And this is true, even though, as in every contract, the other party to the contract may also derive benefits. Mutuality of benefits lies behind every contract. And the fact that a party to such contract may derive a benefit or impose conditions in the carrying on of an enterprise which transcend the usual conditions, does not destroy the independent character of the other party.

■ In a sense, in this complex and interdependent world, no one is really independent. But when, through a formal and written instrument, a relationship is established by which exclusive possession and control of property is turned over to another, in exchange for a specified rental, with full responsibility for the conduct of the business falling upon the lessee, with all profit or loss accruing entirely to him and not to the transferor, the relationship satisfies all the requirements of an independent enterprise. And when a corporation like Richfield deals with such an enterprise, it cannot be said to be dealing *with itself,* as though the estate it created were nothing and the person in charge, to whom possession was turned over, is a mere employee because, under clauses not contained in the contract, they supervise

18. 51 C.J.S., Landlord and Tenant, §§ 1–3; 32 Am.Jur., Landlord and Tenant, Sec. 2.

19. United States v. Standard Oil Co. of California, D.C.Cal.1948, 78 F.Supp. 850. Richfield contended at the trial that, as to certain leased stations, Standard had admitted that they were operated by "independent contractors". But the conclusion reached in the case was not based upon any admission. Standard contested all the way the validity of the tie-in contracts as to "every type" of station involved. And the conclusion that certain station operators were independent contractors was based upon the facts in the case and not upon any admission by Standard. (See Finding 3, 78 F.Supp. at page 875 of Opinion.)

his actions, regulate,—to some extent,—his personal appearance, and do other things, some distinctly illegal, as will presently appear.

█ In this respect, the Timkin case, already referred to, is very revealing. It involved a prosecution under Section 2 of the Sherman Act. It was Timkin's contention,—*as it is the contention of Richfield,*—that certain wholly-owned subsidiaries were *so controlled* by them, that, in reality, *they were not other corporations* with which they could conspire to violate the Act. But the Supreme Court declined to allow the control to destroy the existence of the units as separate business entities, and held that the law was violated when Timkin engaged in the prohibited acts *with its own subsidiaries.* Just as Richfield here would have us characterize their relationship with the L–O stations by some name unknown to common-law categories, Timkin, in that case, resorted to the term "joint venture" to avoid the charge of illegality. But the Supreme Court's answer was brief and decisive: "The fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws. E. G. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, supra, 340 U.S. at page 215, 71 S.Ct. 259. Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture'. Perhaps every agreement and combination to restrain trade could be so labeled." [20]

The principle which the Supreme Court applied is not new. That Court has repeatedly declared that "common ownership and control does not liberate corporations from the impact of the antitrust laws." [21]

This indicates clearly that the principle is applicable whether we are dealing with a monopoly case under Section 2 of the Act—as the Timkin case was,—or a case in restraint of trade under Section 1 of the Act. Rightly. For in all these cases, the Courts have insisted that "realities must dominate the judgment." [22] And, if control of instrumentalities which results in abolishing competition among them were sufficient to relieve the parties of the effect of the agreement on interstate commerce, the purpose of the Act could be subverted by the establishment by large industrial concerns of "puppet" outlets tied to the parent organization by the most restrictive agreements which would not only unreasonably restrain trade and lessen competition, but actually destroy it.

█ In interpreting this and other statutes, we must eschew the tyranny of words or labels. We must, in each case, get behind the facade which the organization has created,—as did the Supreme Court in the Masonite case when it went behind a del credere agency, which, at first blush, seemed to be a fiduciary relationship established by the concern for its own purposes, and found, instead, a means for monopolization. The Court did not then hesitate to declare the agency a mere cloak for restraints: "So far as the Sherman Act is concerned the result must turn not on the skill with which counsel has manipulated the concepts of 'sale' and 'agency' but on the significance of the business practices in terms of restraint of trade." [23]

█ In the light of these norms, we continue our analysis of the relations established by the written lease. The operator pays for his gasoline and the petroleum products sold to him by Richfield. They are not merely consigned to him. Upon execution of the lease, if he was preceded by another lessee, he pays for the

20. Timkin Roller Bearing Company v. United States, 71 S.Ct. 971.

21. Kiefer-Stewart Company v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 215, 71 S.Ct. 259, 261. and see, Appalachian Coals, Inc. v. United States, 1933, 288 U.S. 344, 360–361, 376–377, 53 S.Ct. 471, 77 L.Ed. 825; United States

v. Yellow Cab Co., 1947, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010.

22. Appalachian Coals, Inc. v. United States, supra, 288 U.S. at page 360, 53 S.Ct. at page 474.

23. United States v. Masonite Corp., 1942, 316 U.S. 265, 280, 62 S.Ct. 1070, 1078, 86 L.Ed. 1461.

inventory of petroleum products on the premises, and of the approved TBA products. He is responsible for credit losses, except such as result from extension of credits to customers carrying Richfield cards. If we consider the provision for 24-hours' termination as valid, the lessee has, at the worst, *a tenancy at will.* And in the American law of landlord and tenant, this is an estate carved out and independent of, but subordinate to, the estate of the transferor.[24] While the ancient common law did not favor this form of estate, it recognized it. Indeed, even in the absence of a statute the courts of England required a notice to quit in order to terminate the estate.[25] State courts, including those of California, have followed the trend of turning an estate at will into an estate for a definite term whenever, through the method of paying rent, or other provisions in the lease, it was apparent that a definite term was contemplated.[26]

So the Courts have done all in their power to give to this estate, so humble in the feudal law, a higher standing in accordance with their desire to achieve a more rational and just relationship than strict application of antiquated feudal principles would warrant. And it is interesting to note that in a very early California case,—even before the law as just stated became crystallized,—the Courts ranked the rights of a tenant at will *so much higher* than those of an employee that they rejected the contention of one who was the caretaker of property of another that he be considered a tenant at will, saying: "Such a principle is not countenanced by the authorities, and its adoption would lead to very inconvenient results. *It would give to servants and agents novel and embarrassing powers over employers*

*and their property."* [27] (Emphasis added.)

And I am inclined to think that, because of the conflict of the 24-hours' termination clause with the monthly rental provisions, Courts would consider the tenancy created by the L–O agreements, *at least,* a month-to-month tenancy *terminable only* upon the minimum notice required in such cases.

In the case before us, there is no evidence that it was ever used as a means for terminating the lease for the infraction of any of its express conditions. It was used only to enforce the illegal restraints superimposed orally. Indeed, it was the boast of the representatives of the Company that so long as the provision as to exclusive dealing in Richfield products or Richfield sponsored TBA products were complied with, the tenancy was of practically *unlimited duration,* and that prospective lessees *were so informed.*

V

The Oral Requirements Restrictions

So we come to the question: Is the independence, both legal and factual, created by the lease destroyed by the oral agreements and conditions superimposed by Richfield and which binds the lessee to the distribution of Richfield petroleum products and Richfield sponsored TBA products under penalty rigidly enforced,— as the record shows,—of ouster unceremonious on 24-hours' notice, sometimes effected between sundown and sunup of successive days? Richfield insists that it is. The fact of control is admitted in their Answer, which states: "That each of the service stations owned by Richfield or leased by Richfield from a party other than the operator thereof, was acquired and/or constructed by Richfield as an outlet for the sale of Richfield petroleum products to

24. 51 C.J.S., Landlord and Tenant, § 156; 32 Am.Jur., Landlord and Tenant, Secs. 66–70; Restatement, Property, Secs. 21, 45; California Civil Code, § 761; and see, Smith v. Royal Insurance Company, Ltd., 9 Cir., 1940, 111 F.2d 667, 670–671, 130 A.L.R. 812.

25. Spiritwood Grain Co. v. Northern Pacific Ry. Co., 8 Cir., 1950, 179 F.2d 338, 341.

26. Phelan v. Anderson, 1897, 118 Cal. 504, 505–506, 50 P. 685; see, Psihozios v. Humber, 1947, 80 Cal.App.2d 215, 220, 181 P.2d 699; Camp v. Matich, 1948, 87 Cal.App.2d 660, 667, 197 P.2d 345.

27. Mitchell v. Davis, 1862, 20 Cal. 45, 47–48. This early case enunciated a rule, which has since become general. 32 Am. Jur., Landlord and Tenant, Sec. 9.

the motoring public; and that each operator of any such service station has been selected and trained by Richfield and has been permitted by Richfield to occupy such service station and use Richfield's land, building, facilities and equipment on a temporary basis subject to termination on 24-hours' notice."

Evidencing the rigor with which the control was exercised, there were shown at the trial instances of termination of the lease for failure to conform to the restrictions as to the products to be sold. On termination, no matter, how long the occupancy had been, the lessee was not allowed to choose his successor, even in cases where the latter had agreed to purchase from him not only the petroleum products and approved products, but also the non-approved items on his shelves or equipment which he had installed. On termination, it was Richfield's policy to instruct the buyer that he "was not required" to buy the non-sponsored TBA products or other equipment owned by the lessee. And in all instances in which the suggestion was made, "he did not buy". Nor did Richfield allow the lessee to capitalize on his good will. On termination, the lessee could receive no compensation for good will, even when he found a buyer willing to pay for the good will which the long occupancy and the efforts of the lessee had created at the particular station.

These and other incidences of control, not spelled out in the lease, but made effective through Richfield's exercise of power, led Richfield to insist at the trial that their control over the L–O type station *was*, in effect, *ownership*. And they sought to apply to this ownership my state-

ment in the Standard case that restrictive agreements are not prohibited as to wholly-owned outlets.[28]

We need not quarrel with the statement referred to, although the form in which it was cast indicates clearly that it applied only to the facts there before the Court. However, the discussion which precedes indicates that the Supreme Court has held repeatedly that even ownership does not stand in the way of the application of the restraint provisions of the Sherman Anti-Trust Law.[29] And the obvious answer to the claim of ownership is the same which Courts give in tax cases to contentions of taxpayers who, after having chosen to do business under a certain form of organization, try to have us disregard it, on the ground that they were, in reality, "doing business with themselves".[30] And the answer is that a person choosing a particular entity in order to achieve certain results is not in a position to ask us to disregard it, when he wishes to avoid results unanticipated.

So Richfield is tied to the form they chose. And if it does not give them immunity from the admitted restraints they impose through it, they must bear the consequences of their voluntary act, regardless of any contrary intention they may have had.

## VI

### The "Created" Market

 Richfield contends that it "created" these instrumentalities for its own purpose. For this reason, they argue that there could be no restraint of trade, because no competition is involved.[31] No

28. United States v. Standard Oil Company of California, D.C.Cal.1948, 78 F.Supp. 850, at page 854.

29. See cases cited in Notes 21 and 22. And see, Associated Press v. United States, 1945, 326 U.S. 1, 15, 65 S.Ct. 1416, 89 L.Ed. 2013.

30. Pacific Magnesium, Inc., v. Westover, D.C.Cal.1948, 86 F.Supp. 644, and cases cited in Notes 4–6 therein; Pacific Magnesium Co. v. Westover, 9 Cir., 1950, 183 F.2d 584.

31. There is a statement in one of the cases to which they refer, Wm. Goldman Theatres, Inc. v. Loew's, Inc., 3 Cir.,1945, 150 F.2d 738, 743 which reads: "The restraint of trade contemplated by the statute means restraint of competition. Eastern Retail L[umber] D[ealers'] Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788."
 In the case to which reference is made in support of this statement, Eastern States Retail Lumber Dealers' Ass'n v. U. S., 1914, 234 U.S. 600, 610, 34 S.Ct.

case will be found which supports the contention that the mere creation of an exclusive form of outlet is, in itself, sufficient to avoid the consequences of the anti-trust laws. Indeed, one of the older cases[32] to which the case cited by Richfield referred as its authority, specifically holds that contracts, no matter how worded, will be scrutinized in order to determine whether they have been entered into or are to be performed for the apparently legitimate purpose which they specify on their face or *for the purpose of restraining the free flow of commerce.* We quote the language of the Court: "The court in the Standard Oil Case construed the act as intended to reach only combinations unduly restrictive of the flow of commerce, or unduly restrictive of competition, and, illustrating what were such undue or unreasonable combinations, it classed as illegal [Standard Oil Co. v. U. S. 221 U. S. 1, at p. 58, 31 S.Ct. 502, 55 L.Ed. 619] 'all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act, or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of *reasonably forwarding personal interest and developing trade, but, on the contrary, were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy.' "[33]* (Emphasis added.)

And in the very case referred to, the following is given as the purpose of the anti-trust statutes: "Combination which unreasonably limits competition which would otherwise exist between persons in similar businesses is illegal. A suppression of competition necessarily restrains commerce. Board of Trade [of City of Chicago] v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207. The purpose of the anti-trust laws— an intendment to secure equality of opportunity—is thwarted if group-power is utilized to eliminate a competitor who is equipped to compete."[34]

■ The vice of the entire argument lies in the fact that it permits suppression of competition *at the inception of an enterprise,*—a practice against which the Clayton Act is specifically directed. As is shown in this case,—a concern such as Richfield, through investment of large sums of money in real property and on stations, could so tie the hands of the sellers of its products as to completely shut out competition. If the fact that no outlets for the product existed before Richfield entered the field, would give complete immunity, regardless of the purpose for which the outlets are established and of the manifest intent to keep out competitors and to deny to the public at large access to competitive products through these outlets, then the anti-trust laws could be circumvented easily.

■ But the argument lacks substance. The trade was there, it being the custom for which it was bidding. And, if in bidding for it, it eliminated others and prevented their access to the products, the market is unreasonably restrained. As said by a unanimous Supreme Court: "In order to establish violation of the Sherman Anti-Trust Act, it is not necessary to show that the challenged arrangement suppresses all competition between the parties or that the parties themselves are discontented with the arrangement. The interest of the public in the preservation of competition is the primary consideration. The prohibitions of the statute cannot be evaded by good motives. The law is its own measure of right and wrong, of what it

951, 58 L.Ed. 1490, I find no language capable of being epitomized in this manner.

32. Eastern States Retail Lumber Dealers' Ass'n v. U. S., supra.

33. Eastern States Retail Lumber Dealers' Ass'n v. U. S., supra, 234 U.S. at page 610, 34 S.Ct. at page 953.

34. Wm. Goldman Theatres, Inc., v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738, 743.

permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of parties, and, it may be, of some good results.' " [35]

Neither the Curtis case [36] nor the Masonite case [37] warrants the conclusion that the creation of individual outlets creates such immunity. In the Curtis case the Court found that the contracts under consideration created an "agency" between the parties which had none of the features condemned by the anti-trust law. This relationship found to have been legitimately entered into by the Federal Trade Commission on findings of fact conclusive upon the Court, the Court found no legal reason to condemn, saying: "The engagement of competent agents obligated to devote their time and attention to developing the principal's business, to the exclusion of all others, where nothing else appears, has long been recognized as proper and unobjectionable practice. The evidence clearly shows that respondent's agency contracts were made without unlawful motive and in the orderly course of an expanding business. It does not necessarily follow, because many agents had been general distributors, that their appointment and limitation amounted to unfair trade practice. * * * Effective competition required that traders have large freedom of action when conducting their own affairs. Success alone does not show reprehensible methods, although it may increase or render insuperable the difficulties which rivals must face. The mere selection of competent, successful and exclusive representatives in the orderly course of development can give no just cause for complaint, and, when standing alone, certainly affords no ground for condemnation under the statute." [38]

The Masonite case has already been commented on. (Part IV of this Opinion.) There the Court found no difficulty in condemning what were apparent del credere agencies as means for illegitimate restraint. Convinced that the object of the establishment of the agency was to restrain commerce, the Court found no difficulty in disregarding the form. Richfield has enunciated an abstract concept which finds no justification in the history or interpretation of the anti-trust laws. To follow it would mean to turn defiance of law into a virtue, to make legitimate the very *means* of restraint. Granted that a business may create its own outlets, it can do so only by making them *its agency in truth and fact*. It cannot do so by creating a well-recognized legal estate, superimpose on it oral limitations, the object of which is to restrain trade, and then claim legitimacy for this very restraint. Even exclusive agencies, if they are of such character as to result in substantial lessening of competition, would be violative of the Clayton Act, although, at their creation, they did not violate the Sherman Act.

So Richfield cannot, by creating the relationship of landlord and tenant, long and anciently known to our law, with all the responsibilities that such relationship imposes on the transferee, restrain trade through that outlet by imposing illegitimate oral contracts which restrict the transferee to the handling of Richfield's products or Richfield's sponsored products. Even if it be admitted that if the outlet were its "exclusive agency", the limitation could be imposed as an incident of ownership, under the form it has chosen, Richfield cannot deny to the dealers the right to deal with other suppliers as to their products, or to deny

35. Paramount Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 44, 51 S.Ct. 42, 45, 75 L.Ed. 145.

36. Federal Trade Commission v. Curtis Publishing Company, 1923, 260 U.S. 568, 43 S.Ct. 210, 213, 67 L.Ed. 408. The scope of the case is so limited in Carter Carburetor Corp. v. Federal Trade Commission, 8 Cir., 1940, 112 F.2d 722, 736.

37. United States v. Masonite Corp., 1942, 316 U.S. 265, 280, 62 S.Ct. 1070, 86 L. Ed. 1461.

38. United States v. United States Steel Corp., 1920, 251 U.S. 417, 451, 40 S.Ct. 293, 64 L.Ed. 343.

to such suppliers access to the dealers, so that these varied products may reach the public, whose protection the anti-trust laws seek. The law, as the Supreme Court has stated, "does not compel competition".[39] But restrictive contracts are condemned because of their "denial to commerce of the supposed protection of competition."[40] And, as said in the same case, when such restrictions "are parts of a plan, the mere projecting of which condemns them unconditionally, the realization of the plan itself must also be proscribed."[41]

 It follows that the L-O operators are, by the instrument of their creation, independent business men, as that concept is understood in anti-trust law, and that the imposition on them by oral agreements of restrictive conditions limiting their dealings to Richfield products and Richfield sponsored TBA products, and denying access to other dealers in petroleum and accessories to these stations,

and, through them, to the public, is violative of both Section 1 of the Sherman Anti-Trust Law and Section 3 of the Clayton Act.

## VII

### The "Dealer" Stations

We come now to the agreements under which the other stations are operated. We refer to the 337 stations and to the 3-C stations. As to these stations, Richfield admits that they are independent. Their chief witness and general manager in charge of sales, W. G. King, admitted that they were such, and he applied the designation to station dealers "who owned their places of business or leased them from others than Richfield."

The problem as to these stations is, therefore, a factual one: Do the written instruments under which these stations dispense Richfield products and Richfield sponsored TBA products and the oral agreements accompanying them restrict

39. United States v. United States Steel Corp., supra, 251 U.S. at page 451, 40 S.Ct. at page 299.

40. United States v. Aluminum Company of America, 2 Cir., 1945, 148 F.2d 416, 428.

41. United States v. Aluminum Company of America, supra, 148 F.2d at page 428. And see, Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 356, 42 S.Ct. 360, 66 L.Ed. 653; M. A. Adelman, "Effective Competition and the Anti-Trust Laws", 1948, 61 Harvard Law Review, p. 1289. It should be added that, in the solution of the problem which confronts us, we must bear in mind the type of legislation which we are interpreting. And cases holding operators of stations of this type *employees* under a state Workmen's Compensation Act, Continental Oil Co. v. Sirhall, Colo.1950, 222 P.2d 612, or subjecting individual stations to state chain store taxes, Standard Oil Company of Indiana v. State Board of Equalization, 1940, 110 Mont. 5, 99 P. 2d 229; Maxwell v. Shell Eastern Petroleum Products, Inc., 4 Cir., 1937, 90 F.2d 39, do not help. For, in interpreting Workmen's Compensation or taxing statutes, Courts notoriously interpret their terms broadly, so as to achieve the beneficent social aims of the statutes. See, Fox v. Standard Oil Co., 1935, 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780. Nor,

for that matter, are we assisted by the recent decision of the District Court of Appeals of California, Hayes v. Richfield Oil Corp., Cal.App.1950, 229 P.2d 32, which has held Richfield liable to third persons for injuries suffered on the premises of one of the L-O stations. The case was decided upon the theory, submitted to a jury, that, in view of the public purpose of the business conducted on the premises, the lessor could be held liable, if the leased premises *were not safe for the use intended*, and the condition existed at the time of the transfer.

This decision is in accord with the general view that, while a landlord of leased premises is not ordinarily liable for the injuries occurring thereon, he will be held liable where the property is leased for public purposes,—which the public is expected to enter for the transaction of business. 32 Am.Jur., Landlord and Tenant, Sec. 668. So the California Court, in applying this rule to one of the L-O stations, did not make a determination of the nature of the occupancy, binding on us.

On May 17, 1951, the Supreme Court of California granted a hearing in the case. This means that the Opinion loses all force as a precedent. For the Supreme Court may repudiate the doctrine announced in it. But even if it should stand, it does not go counter to views here expressed.

them to the handling of these products exclusively?

Richfield has classified these stations as "dealer stations". They include service stations which are owned by service station dealers or leased by them from a lessor other than Richfield. Richfield has leased these stations from the dealers, and, in turn, has sub-leased them back to the dealers and has entered into a written sales contract with each dealer covering the petroleum products to be handled by the dealer. Each of the units into which this group is divided—337 and 3–C—is governed by multiple instruments.

In the case of the 3–C stations, the fundamental instrument is a service station lease, originally running from the owner to Richfield, and an operator's lease from Richfield to the operator, the operator assuming, in substance, the obligations of Richfield under their primary lease, with some modifications at times as to the rent paid. The record discloses that in some instances, the rental received by Richfield from the operator is less than it pays under its lease with the owner.

For brevity's sake, we omit the description of the terms, which are the usual terms in such leases. Their enumeration would not aid the discussion, because the tie-in as to these stations is represented by an operator's sales contract whereby the operator agrees to purchase from Richfield a *definite* quantity of gasoline, lubricating oil and greases for each month. The evidence in the record shows that the computation is intended to cover 80 per cent of the estimated requirement.

As to the other stations, presumably stations owned by the operator as to which no landlord and tenant relationship exists between Richfield and the operator or Richfield and the original owner, the tie-in agreement consists of a sales contract of the type already described and a painting agreement whereby Richfield agrees to paint the station in its own colors and insignia. After an expenditure of a definite sum of money, the dealer agrees to "remove from the surface of the station which is to be painted all signs and insignia, and upon completion of the paint-ing of said service station by Richfield, shall not place upon or over the painted surfaces any advertising sign, trademark, insignia, or any other matter without first procuring the consent and approval of Richfield." And Richfield retains the right to cause the removal of any signs placed in violation of this clause. The violation of any of the terms of the agreement makes the dealer liable to Richfield for the amount expended in painting.

It is quite evident that the aim of the sales contract is to so control the outlet for petroleum products that there is little, if any, room left for dispensing products other than those contracted for. Such arrangements were envisaged by me in the Standard case. And it was pointed out in that opinion that, while an agreement of this character would as effectively shut out access to other products, it still left a *possibility* of dealing with others should the operator be unable to secure his full supply from the contracting supplier.

The painting agreement is obviously intended to secure an exclusive outlet under the guise of a painting agreement. Richfield is not in the business of painting. And the undertaking to paint at a certain cost in consideration of flying its colors under penalty of repayment when the agreement is breached, when tied to a sales contract which envisages 80 per cent of the needs of the operator, and to which the painting contract specifically refers,—could have but *one object*,—i. e., to shut out all competition. And, in reality, that was *the effect* of the arrangement.

Richfield's witnesses testified that the instructions to their representatives were "to persuade" the dealers working either under 337 or 3–C arrangements to confine themselves to Richfield products. On the other hand, individual operators of these types of stations have testified to the fact that they were "coerced" into limiting themselves to Richfield products, that they were "called on the carpet", as it were, if other products were on their shelves.

It is not denied that Richfield maintained a policy against "split" pumps,—that is, pumps of other gasoline distributors.

And it is quite evident that, in one form or another, the policy has been enforced, and that the moment gasoline of another concern was handled by any of the operators on these leases,—as one of their own witnesses put it,—Richfield "was no longer interested in the station", and terminated their relationship. Some of Richfield's own field representatives, called by the Government, testified that their instructions as to these stations were not to accept them and sell products to them, except upon a hundred per cent basis, i. e., that they deal only in Richfield products. Unauthorized signs were reported to Richfield. Orders were given to remove these competitive signs, when discovered. And, as to both types of stations, Richfield salesmen testified that their instructions were that only approved merchandise was to be handled, and that they understood the sales and painting agreements to call for that policy, and so informed the operators of "dealer" stations.

There is also evidence that, despite the asserted independence of these operators so far as TBA products are concerned, in reality, there was coercion to induce them to confine their dealings to the sponsored products. In truth, there is evidence that the policy of the Company was that if "any dealer" refused to interest himself in Richfield sponsored TBA products, "then it's a new dealer",—i. e., the instructions were to cancel the arrangement, whatever it was.

The fact that non-sponsored TBA products were more profitable to the dealers, either because of better discounts or quicker fulfillment of warranties, shows Richfield's motivation in keeping this trade for itself by means of these agreements. It is true there were denials by witnesses for Richfield. But it is significant that the denials are mostly by persons who either made policy or carried it into effect, or who testified to instructions given or received on the subject.

On the other hand, the existence of the practice is testified to by men in charge of the stations or by men in the field who testified to *particular* experiences and incidents.

So the trier of fact must choose. And, when confronted by a series of instruments, the sole object of which is to tie these stations to contracts which, in effect, are *requirement* contracts, although not so denominated, the testimony of the men in the field who actually were told that they *could not* trade freely with outsiders fits into the scheme which the sales contracts coupled with the leases, and the sales contracts coupled with the painting agreements, evidently were intended to set up.

We conclude, therefore, that the agreements relating to L–O, 337 and 3–C stations under which Richfield has operated in the six named States, are, and each of them is, in their creation and effect, in violation of Section 1 of the Sherman Anti-Trust Act and Section 3 of the Clayton Act.[42]

42. Richfield seems to find comfort in, and justification for, its position in an article, "Exclusive Dealer Devices of Petroleum Products", by Forrest Revere Black, 1940, 29 Georgetown Law Journal, p. 438 et seq. The article was written before some of the most important decisions in the field of anti-trust law, including the decisions in the Standard case dealing with restrictive contracts, were made. More, a study of the article shows that what the writer sought to show was various devices resorted to by certain companies in order to *avoid* the consequence of regulatory statutes.

His introductory paragraph reads: "In any comprehensive history of government regulation of business in America, one chapter must be reserved to relate *the strange story of the ingenious strategy* of the major oil companies in marketing their products through the so-called 'Iowa Plan' and cognate devices, whereby the operator *simulates* the appearance of an independent dealer and the major producing companies thereby *acquire an exclusive outlet and attempt to evade* the obligations of chain store taxes, social security legislation, Workmen's Compensation Laws, public liability insurance and labor troubles from attempts at unionization and collective bargaining." (p. 429.) (Emphasis added.)

Speaking more specifically of petroleum products, the article states: "The retail marketing of petroleum products has gone

Judgment will, therefore, be for the plaintiff upon the following specific findings:

(1) The Richfield agreements as to each of the three types of stations relate to interstate commerce.

(2) They affect, and the transactions under them are, in the course of interstate commerce.

(3) The relation established by each of the three types of agreements, L–O, 337 and 3–C, is that of independent contractor, each of the operators being an independent business man, as that term is understood in anti-trust law.

(4) The 24-hours' termination clause has been used as an instrumentality to force upon the lessees of L–O stations illegal restrictions as to the types of petroleum and sponsored TBA products to be handled on the premises.

(5) The 24-hours' termination clause is invalid, against public policy, and cannot, either under state or federal law, be enforced as a means of terminating the lease for even legal grounds by any notice by either side less than at least the minimum rental period for which rent is reserved, one month.

(6) Richfield should be prohibited from using the 24-hours' termination clause at all to enforce its restrictive conditions as to the products sold on the premises.

(7) The agreements in the form of leases, sales contracts and/or painting contracts, and the oral agreements superimposed on them confine the operations of the stations to which they apply to dealing exclusively with Richfield petroleum products and automotive accessories handled or sponsored by Richfield.

(8) The agreements lock out dealers from sources of competitive products originating in interstate commerce.

(9) The agreements deny to dealers and, through them to the public, access to such competitive products.

(10) The agreements deny to manufacturers or suppliers of such products access to the outlets controlled by the independent business men who operate the three types of stations.

(11) The agreements affect a substantial number of outlets and a substantial amount of products, whether considered comparatively or not.

(12) The agreements constitute an unreasonable restraint of trade and commerce among the States, under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.

(13) The agreements result in a substantial lessening of competition and tend to create a monopoly in a line of commerce in contravention of Section 3 of the Clayton Act, 15 U.S.C.A. § 14.

(14) The agreements are illegal in their effect and should be enjoined.

through several stages. The dominant consideration on the part of producers has been a mad race to secure additional retail outlets and increased gallonage, and usually connected with this has been *an attempt to exclude the sale of competitor's products and to control the resale price.*" (p. 439–440.) (Emphasis added.)

While describing the various marketing methods, including what is known as the "Iowa Plan",—the general effect of which is to make the operator simulate the appearance of an independent dealer when he is, in reality, the manager of a chain store,—*the author does not give them his approval* as successful attempts at avoiding the effect of controls. But, even if such methods of evasion appealed to a lawyer, they certainly *do not deserve* the approval of a Court. In the field of anti-trust regulations, the aim of courts has always been to look behind devices which, under the appearance of innocuous arrangements,—such as exchange of information, listing of customers and the like, involved attempts to restrain and prevent competition and to enthrone monopoly. So here, our problem is to see what the *true relationship* is, regardless of what Richfield and the operators under its domination *thought it to be.* And, as already appears, what to Richfield may seem *apparent* independence is demonstrably *real* independence, so far as the application of principles of anti-trust law are concerned. So, to apply a philosophical phrase, what to Richfield seems to be mere *appearance*, has, to us, all the indicia of *reality*.